## HOWLAND *vs.* COFFIN and others.

From a judgment directing that the plaintiff recover of the defendants $42.05 damages, without costs; that the defendants recover of the plaintiff $42.05, for costs and disbursements; and that the said judgments be offset against each other, an appeal lies.

A contract by which the owners of a steamship agree to pay a broker a specified commission for obtaining a charter of their vessel from the United States government, is not void on the ground that it contravenes public policy.

The defendants agreed to pay H., on account of his obtaining a charter from the government, for a steamer owned by the defendants, "five per cent on amount of charter, say $200 per diem, more or less, so long as the vessel should remain in government service." A charter was obtained, through the agency of H., on the 15th of April, 1862, at $200 *per diem*, and the government ,paid the defendants that sum, until March 25, 1863, when, by an indorsement on the charter, it reduced the *per diem* compensation to $120, which sum the government continued to pay until December 1, 1863. *Held* that the charter obtained by H. did not cease to exist, upon the reduction of the compensation, and its identity was not affected by the indorsement; but that it was retained by the parties thereto as the compact by which they were to be governed during the continued employment of the vessel. And that the defendants were liable to H. for a commission of five per cent on $200 *per diem* to March 25, 1863, and on $120 *per diem* from that date to December 1, 1863.

THIS is an appeal to the general term from an order refusing a new trial, and also from a final judgment rendered on a verdict of a jury. The facts of the case are these : The appellant's business was that of selling and procuring charters for vessels. The defendants (twelve in number) are the owners of the steamboat Seth Low. Several of the owners of the boat requested the appellant, as a broker, to procure a charter for her, and stated their price. The appellant told them he was doubtful if he could get the $200 per day, but would do the best he could for them. The usual rates of commissions for negotiating or procuring a charter at that time were ten per cent on the amount of the charter. The appellant brought the parties together, and by his services procured a very favorable charter for this vessel, at the rate of $200 per day. At the time the charter was made, or shortly prior to it, the master of the Seth Low, *as master,*

and on behalf of the owners (the respondents,) signed the following contract with the appellant, in order to secure him his brokerage : " I hereby agree to pay to Solon Howland, on account of his obtaining a charter from the government for the steamer Seth Low, five per cent on amount of charter, say two hundred dollars per diem, more or less, so long as she remains in government service." The vessel went into the government service on the date of the charter, viz . April 15, 1862, and after the signing of this agreement, and remained therein up to the 1st day of December, 1863, when a new charter, with entirely different provisions, was entered into between the government and the owners of the vessel. No claim was made by the plaintiff on the trial for commissions on the services of the boat after December 1, 1863. The government paid the defendants the $200 per day, regularly, up to March 25th, 1863, when it reduced the per diem compensation to $120 per day, which was paid until December 1, 1863, the date the new charter was made. The old one was then closed up, surrendered and considered as cancelled by the officers of the government. All of the receipts, prior to December 1, 1863, for the per diem compensation of the boat, were paid on the original charter of April 15, 1862. They all refer to that on their face. All of the payments made by the government for the charter of the vessel between April 15, 1862, and December 1, 1863, were either entered on the original charter of April 15, 1862, or intended so to be. The owners of the vessel recognized the right of the master of the vessel to bind them to the plaintiff's compensation by the contract in question, and their clerk or treasurer regularly paid him his five per cent on the charter money received by them until March, 1863, when they refused to pay him any more, on the ground that the reduction by the government of the price from $200 to $120 per day, was in effect a new charter of the vessel at that price from the time of the reduction, viz. March 25, 1863. Up to that time the respondents had received from the government $68,800, being the charter

Howland *v.* Coffin.

money from April 15, 1862, to March 25, 1863, at $200 per day. The plaintiff's commissions on that were $3440. The amount actually paid him was $3390, leaving due to him $50 on the five per cent on the rate at $200 per day, besides interest from July 21, 1863, making in all $55.25. The respondents received for the charter money of the vessel at the rate of $120 per day, from 25th of March, 1863, up to December 1, 1863, on the original charter of April 15, 1862, the sum of $30,120, on which would be due, according to the claim of the appellant, the sum of $1516, besides interest. The claim of the appellant was, therefore, as follows, viz :

Balance of compensation at five per cent on the $200 per
  day, including interest to date of trial,  . . .   $55.25
Amount of commission on the $120 per day, in-
  cluding interest to date of trial, . . . . . . .   1,621.00
  
Amount claimed to be due by the plaintiff, . . .  $1,676.25

The cause came on for trial before Justice Bockes and a jury. He ruled, and directed the jury to find, that the plaintiff was " entitled to recover in this action five per cent according to this contract, for $200 per day, between April 15, 1862, and March 25, 1863, when the original charter party was surrendered or abandoned and substantially a new charter party formed." To this ruling the plaintiff's counsel excepted.

The plaintiff then requested the court to charge—

1st. That the plaintiff was entitled to recover five per cent on the amount of charter moneys actually received or earned by the defendants from April 15 until December 1, 1863, the date of the second charter. This the court refused, and the plaintiff excepted.

2d. That the plaintiff was entitled to recover five per cent on $200 per day, from the time the steamer entered into service under the charter party of April 15, 1862, until December 1, 1863. This was refused, and the plaintiff excepted. The

plaintiff's counsel requested the court to rule that the indorsement reducing the price of the charter from $200 per day, unto $120 per day, amounted to nothing, as concerned the plaintiff, and he was therefore entitled to recover five per cent on $200 a day for the whole time. This was refused, and the plaintiff excepted. Under the direction of the court, in a charge corresponding with the above rulings, the jury found a verdict for the plaintiff for $42.05, to which rulings the plaintiff again severally excepted. It appeared in evidence called out by the defense that the reason why the words "more or less" were inserted in the contract made with the appellant for his compensation, was because the plaintiff had chartered boats where there had been a reduction made afterwards. He supposed the respondents were getting a "big charter," and he thought the boat would not get that price all the time. The appellant proved that he did not consent to the reduction to the $120, nor had he any notice of it until afterwards, just before suit commenced. It appeared further that the indorsement on the charter of October 1, 1863, which was made in March,.1864, was made after the commencement of this suit, and had relation back to April 1, 1863, and not to March 25, 1863, thus leaving six more days on which it was claimed the plaintiff's per centage would have been, under the court's construction, $66 more.

The judgment entered ordered and adjudged that the plaintiff recover of the defendants the sum of forty-two dollars and five cents damages, without costs ; and that the defendants recover of the plaintiff the sum of forty-two dollars and five cents, for their (the said defendants) costs and disbursements in this action, and that such judgments offset each other.

The plaintiff appealed.

*D. McMahon,* for the appellant. I. The reasonable construction of the contract under which the plaintiff claimed his commissions, is : (1.) An agreement to pay the plaintiff

Howland *v.* Coffin.

five per cent on the amount to be received by the respondents under the charter of April 15, 1862, whether it be $200 per diem, or more than that amount, or less than that amount, otherwise to what do the words "more or less" refer? (2.) To keep on paying to the plaintiff that amount of per centage as long as the vessel remained in government service, otherwise what is the meaning of the words "so long as she remains in government service?" Any other construction, we maintain, was erroneous, and the court below, therefore, erred in their rulings, and the plaintiff was entitled to recover his claims. When a clause is capable of two significations, it should be understood in that which will have some operation, rather than in that in which it will have none. (*Archibald* v. *Thomas,* 3 *Cowen,* 284.) The whole covenant is to be taken together, and if the intention of the parties be doubtful, that construction is to be adopted, which is most beneficial to the covenantee. (*Marom* v. *Stone,* 2 *Cowen,* 781.)

II. The circumstances surrounding the contract at and subsequent to its execution and duration, give effect to our construction of the contract, and prove the error of the court below. 1. The plaintiff considered the defendants were getting a big charter, and there would be at some time or other a reduction, and so put in the contract, on which he sued, the words "more or less," and as long as she remained in the government's employ. 2. These words "more or less" appear to have been the subject of discussion between the plaintiff and the master of the Seth Low, when they were put in, at the time of the latter's signing the contract in suit. 3. The commissions agreed to be paid to the plaintiff, were actually one half of the usual commissions in such cases. 4. The charter of the 15th of April, 1862, was a charter *for thirty days, and as much longer as her services may be required,* to be used as a tug or transport in Chesapeake Bay, whence she must proceed with all practicable dispatch, and such other place or places as she may be required, &c. Thus showing that all parties contemplated that the government would keep

her longer than the chartered time. 5. By the charter, it is further provided that at its expiration, the steamer shall be returned to New York, and compensation should cease when she should be so returned. Thus showing that the parties contemplated that the vessel would be in government employ under that charter for a longer period than the thirty days. She was never returned to New York, until the new charter was made. 6. She was in fact in the government employ without any new charter, from April 15th, 1862, until December 1st, 1863, when a new charter was made out, for any commissions under which we do not claim. The only change in the old charter in the meantime being a reduction of the $200 per day, to $120 per day. 7. The parties, viz. the government and the owners of the boat, notwithstanding the reduction, considered they were acting under the charter of April 15, 1862, up to December 1, 1863. All the defendants' bills and receipts were made out up to December 1, 1863, under the original charter of April 15, 1862. Also the certificates of payments indorsed. In construing a written instrument it is proper to look at all the surrounding circumstances, and the pre-existing relations between the parties. (*Blossom* v. *Griffin*, 13 *N. Y. Rep.* 569.)

III. The reduction of the chartered price of the steamboat in question, from $200 to $120, was not such a new charter of the boat as would defeat the plaintiff's claim to his commissions, for, (*a.*) It was done by a mere indorsement on the charter of April 15, 1862. (*b.*) This indorsement was done without the knowledge or consent of the plaintiff. It did not have relation by its terms back to March 25, 1863, according to the court's rulings, but to April 1, 1863. (*c.*) It did not in any way affect the other provisions of the charter of April 15, 1862, nor was it intended so to do, between the parties, excepting in the single case of the amount, as both sides acted under the original charter in every other respect from that time, until the new charter of December 1, 1863, was made up. Captain Stinson says he never heard of any other

charter than the one of April 15, 1862, after the endorsement of March 23, 1863. (*d.*) The words "*more or less*" contained in the contract on which the plaintiff sued, contemplated that the right to his commissions would exist notwithstanding any such reduction ; even if it did not, the owners of the vessel could not make such an endorsement without the plaintiff's knowledge or consent, and thereby deprive him of his right to his commissions. If they could in the face of the provisions of the contract on which he sued, they could do so by the slightest diminution in the amount of the chartered price at any time after it was made. (*e.*) The charter itself was under seal ; the indorsement was by parol. (15 *Wend.* 400.) To give effect to the indorsement amounting to a new charter, it must appear that the parties intended a surrender of the original charter in all its parts and provisions, not a mere reduction of the per diem.

IV. The court below erroneously permitted the new charter of December 1, 1863, to be introduced in evidence. (*a.*) The plaintiff in his objection distinctly announced, he made no claim for any commissions on any part of the service of the boat under the charter of December 1, 1863. (*b.*) The transaction under the charter of December 1, 1863, was entirely distinct from that under the charter of April 15, 1862. The stipulations of the two charters were distinct and separate. (*c.*) It appeared on its face, that it was *to go into effect at* 12 *o'clock M. of the* 1*st day of December*, 1863, which did not embrace any time for which the plaintiff sued.

V. The indorsement on the charter of December 1, 1863, was also improperly admitted. (*a.*) That indorsement was got up on April 28, 1864, which was after the commencement of this suit, and was evidently collusively made, with a view to deprive the plaintiff of his standing under the charter of April 12, 1862, after the date of the reduction to $120. (*b.*) This indorsement also contradicted the provisions of the charter itself, which provided that the charter should go into effect at 12 o'clock, M. of the 1st day of December, 1863,

and should so continue &c. (*c.*) The plaintiff was no party to it, nor did he ever consent to it. A broker is entitled to his commissions where he brings about a bargain, charter or sale, and when a contract is entered into, the parties to it can not afterwards, by agreement between themselves, withdraw the matter from the broker's hands and deprive him of his commissions. Services of this kind are not *contra bonos mores*. (*Mills* v. *Mills*, 36 *Barb*. 474. *Sedgwick* v. *Stanton*, 14 *N. Y. Rep*. 289. *Wilkinson* v. *Martin*, 8 *Carr. & P*. 183. *Chitty on Contracts*, 547. *Hosford* v. *Wilson*, 1 *Taunt. p*. 12. *Glentworth* v. *Luther*, 21 *Barb*. 145. *Corning* v. *Calvert*, 2 *Hilt*. 56.)

VI. The court below erred in refusing to rule that the indorsement on the charter of April 15, 1862, reducing the price, amounted to nothing as concerns the plaintiff, and that the plaintiff was entitled to five per cent on $200 a day for the whole time.

VII. The court below also erred in its rulings on the points involved in this case alluded to in the previous points.

VIII. The verdict, even under the ruling of the court, should have been for $55.25, instead of $42.05. The defendants received for charter from April 13, 1862, to March 25, 1863, $68,800, the commissions on which were $3440, on which he received $3390, leaving due $50, and not $40, as ordered by the court; the interest on which is $5.25. No claim was set up on the trial, that the contract in question was void for want of mutuality or under the statute of frauds. The verdict was also erroneous under the ruling of the court in this point of view, viz : The court gave effect to the indorsement on the second charter, which, on its face, bore relation back to April 1, 1863, and not March 23, 1863 ; so that if the principle on which the court acted was correct, then the relation back should have been to April 1, 1863 ; then the verdict should have been for exactly $36 more, inasmuch as the difference between March 25 and April 1, was exactly six.

days more, at $120 per day—$720 in all—on which the commissions would have been $36 more.

*Gilbert Dean,* for the respondents.   I. There is no judgment which could be appealed from by the plaintiff.   The judgments for each party, being of the same amount, precisely, and being ordered to be offset, the one against the other, neutralize each other, and neither party could appeal. This court has, therefore, no jurisdiction.

II. If there is a judgment, then the agreement becomes material.   That agreement is limited to "*a* charter," and commissions are limited to *the* charter obtained by him—that is, "five per cent on amount of charter," not *charters.* (*a*) The claim of the plaintiff is, that the words "so long as she remains in government service," do not relate to this contract or charter, but that the vessel was mortgaged to the plaintiff for all time.   (*b.*) On the 25th March, 1863, a reduction in price was made to $120 per day.   This was in Washington, and the plaintiff had nothing to do with it. (*c.*) A new charter-party was made in December, 1863, containing different provisions, one as to the value of the vessel, and it was agreed that it should take effect from April 1, 1863.   (*d.*) The owners objected to making this new charter-party.   Government took the first one, considering it as closed.

III. The judge decided rightly in holding that the charter ended when a new measure of compensation was agreed upon, and that between the captain, who was a part owner, and the government, without the intervention of the plaintiff.   The judgment should be affirmed.

*By the Court,* CLERKE, J.   I. The respondent's counsel make a point that there is no judgment in this case, and, therefore, nothing to appeal from.   The final order provides that the plaintiff recover of the defendants $42.05 damages, without costs, and that the defendants recover of the plaintiff

$42.05 for costs and disbursements, and that the said judgments offset each other—that they neutralize each other. But does it follow that there is no judgment? This order is something; it is a decision—a final decision; and what can that be but a judgment? The respondent's counsel is not correct, therefore, in saying there is nothing to appeal from. There is something; and that something must be deemed nothing else than a judgment—a judgment by which the plaintiff considers he has suffered wrong, and which he maintains is erroneous. The right of appeal could be effectually destroyed in many cases by a judge, if an arrangement of this nature should have the effect claimed by the defendant's counsel. A judgment, whatever may be its provisions, "is the final determination of the rights of the parties." (*Code*, § 245.)

II. I do not think that the contract upon which the plaintiff sues is void on the ground that it contravenes public policy. *Sedgwick* v. *Stanton*, (14 *N. Y. Rep.* 289,) gives us the law very distinctly on this point. Contracts, illegal at common law as being contrary to public policy, are those which injuriously affect or subvert the public interest. By the written contract in the case above referred to, Trowbridge, the assignor of the plaintiff, undertook to obtain, at his own expense, from the state, for Stanton, a title to a lot in Syracuse, which Stanton then used and occupied for a stone yard, for which service Stanton agreed to convey, when the title should be obtained, one undivided half of the said lot. It was held that no public interest was violated in the performance of this contract. Its purpose was to induce the commissioners of the land office to act upon the question of Stanton's preemptive right to the lot. It was declared valid, and the judgment against Stanton was affirmed.

In *Mills* v. *Mills*, (36 *Barb*. 474,) the agreement was to convey land to another upon the consideration that the latter would give all the aid in his power, spend his time, and use his utmost influence and exertions, to procure the passage of

Howland *v.* Coffin.

a law pending before the legislature, granting authority to the covenantor to construct a rail track for the running of cars on Division avenue in Williamsburgh. In the language of the justice who delivered the opinion in this case, "the plaintiff was not employed, as he lawfully might be, to prosecute a private claim, nor to collect information, prepare statements, and furnish arguments, freely and openly to a legislative committee, in favor of any public measure, which might incidentally benefit individuals," but he was to use such exertion and influence covertly, or have done so much to corrupt the public morals and impair the public virtue of the state and nation. It was held that although some of the other considerations mentioned in the agreement were unexceptionable, it was nevertheless void on account of the provisions to which I have referred.

In the case before us, the defendants agreed to pay the plaintiff a certain commission for obtaining a charter from the United States government, for their steamship. We are not to presume, necessarily, because this was a charter to be obtained from the government, that any corruption or improper influences were to be resorted to; or that the undertaking was injuriously to affect or subvert the public interest. We are not to presume any thing wrong in a transaction in which the government is concerned. The plaintiff had as good a right to obtain a charter of this kind for any other person as he would have to obtain one for himself. If the defendants thought it best to employ an agent to procure this charter, who, perhaps, possessed better tact, and had more time to devote to this business, they had a perfect right to do so ; and by doing so, were not doing any thing necessarily detrimental to the public interests. The contract is valid.

III. How far are the defendants made liable by it ? They promised to pay the plaintiff five per cent on amount of charter, say $200 *per diem, more or less, so long as the vessel shall remain in government service.* The charter was obtained by the agency of the plaintiff, and the government

paid the defendants $200 *per diem*, until March 25th, 1863, when it reduced the *per diem* compensation to $120. The defendants admitted that they were bound to pay the commission to March 25, 1863 ; but as the compensation was reduced on that day, they maintain that the charter which the plaintiff obtained ceased to exist ; and from that day he is entitled to no commission. But the precise instrument in which the charter was written was retained between the defendants and the government. Nothing was altered ; not a single provision struck out or modified ; the only change related to the compensation ; and that was merely indorsed upon the instrument. This instrument was dated the 15th of April, 1862 ; it was of considerable length, contained numerous provisions, is very specific, is very carefully prepared, and is, as I have said, retained by the defendants and the government as the compact by which they are to be governed during the continued employment of the vessel by the latter. They both, however, seem to think that circumstances render it proper that the compensation should be reduced ; and they signify this opinion by an indorsement on this same instrument—in every other respect not in the least degree, not in a single sentence or word altered, and, in the words of the agreement, "the vessel remained in government service." The indorsement, in my opinion, has not affected the identity of the instrument, or the transaction ; and the defendants are liable for a commission of five per cent on $200 *per diem* to March 25, 1863, and on $120 *per diem* from that date to 1st Dec. 1863.

The judgment should be reversed, and a new trial ordered ; costs to abide the event.

[New York General Term, November 5, 1866. *Geo. G. Barnard, Clerke* and *Ingraham*, Justices.]