THE KANSAS CITY PAPER HOUSE, *Appellant*, v. THE FOLEY RAILWAY PRINTING COMPANY, *Appellee*.

No. 17,069.

SYLLABUS BY THE COURT.

1. CORPORATIONS — *Private Account of President — Transferred to Corporation.* Where a corporation through its president asks that an account owing to him personally by the holder of its note be credited thereon, this amounts to a transfer of the account from the president to the corporation, and in an action upon the note the plaintiff can not object to the account being used as an offset, on the ground that no formal assignment had been made.

2. REFEREE'S REPORT—*Erroneous Conclusions—Evidence.* Where a referee sustains a motion to strike out certain testimony that has been introduced at the trial, and no order is made reinstating it, such testimony can not be considered by the court in determining whether there was any evidence to sustain the finding of the referee.

3. CONTRACTS—*Selling Goods to Public Board—Agency—Contingent Compensation—Public Policy.* An agreement to pay for services in selling goods to a public board, which does not contemplate the exercise of personal or political influence, and in the carrying out of which no such influence is in fact exerted, and which is otherwise unobjectionable, is not rendered void because the salesman's compensation is made to depend upon the success of his efforts, or because he makes a legitimate argument to one of the members of the board while the others are not present.

Appeal from Labette district court. Opinion filed November 11, 1911. Reversed.

*E. L. Burton,* and *Ellis, Cook & Barnett,* for the appellant.

*Kimball & Osgood,* for the appellee.

The opinion of the court was delivered by

MASON, J.: The Kansas City Paper House, a corporation, sued the Foley Railway Printing Company, a corporation, upon a promissory note. The defendant claimed a credit of $500 on account of an indebtedness of that amount which it asserted was owing to P. T. Foley, its president, by the plaintiff. This is the only matter still in controversy. A referee found in favor of the defendant, and a judgment was rendered accordingly, from which the plaintiff appeals.

The appellant contends that even if it was indebted to Foley, it could not be required to credit the amount upon the note, since no assignment was shown from Foley to the Foley company. Foley, who personally managed the business of his company, testified in substance that he intended the company to have credit on the note for his claim against the paper company, and gave the latter notice to that effect. This in effect amounted to an assignment, and the paper company, being fully protected against a further assertion of the claim by Foley, can not complain of the lack of formality.

The appellant also contends that there was no competent evidence that it owed Foley the $500, because his claim rested upon an agreement which he professed to have made with a salesman of the paper company, who was not shown to have had any authority to bind his employer in that respect, and whose authority was denied under oath in the reply. Foley testified in effect that the paper company, through the salesman referred to, agreed to pay him $500 for his assistance in procuring a contract to supply paper and other material to the state; that he went to Topeka, and in the interest of the paper company "talked up" its goods to a member of the executive council, showing samples; that after the

contract had been awarded to the paper company he had several conversations with its president in regard to his arrangement with the salesman, and that the president did not deny the salesman's authority to make such an agreement. When the Foley company rested its case, the paper company moved "to strike out that part of the conversation in reference to the contract with Mr. Shaw [the salesman], as there is no proof of any authority on the part of Mr. Shaw to make the contract." The record shows that this motion was sustained. The only evidence on the most vital portion of the Foley company's case seems to have been stricken out by this ruling. No order was made reinstating it, and its place was not supplied by any further testimony. It is at least doubtful whether the ruling was not correct, for there was no evidence that Shaw had authority to make the agreement with Foley, unless it is to be found in the testimony that the president of the company, in the course of a conversation, the details of which are not stated, did not deny it. But whether the ruling was right or wrong, the referee, in deciding that the Foley company could recover without the evidence that was stricken out, must have proceeded upon an erroneous view of the law, which necessarily affected the judgment. Where a court makes its own findings of fact from the evidence reported by a referee, it may doubtless take into account evidence which the referee had stricken out, if the circumstances be such that the adverse party is not thereby prejudiced by being deprived of an opportunity for rebuttal. But testimony which the referee has eliminated from his consideration can not be considered by the court in determining whether there was any evidence to sustain his finding. Here the findings and conclusions of the referee were couched in the most general terms, so that his precise theory of the case is not disclosed. This situation requires that a new trial be ordered.

Other questions are argued which will naturally

arise at another trial, and therefore should be decided now. The appellant contends that public policy forbids a recovery upon such a contract as that testified to by Foley. There was some evidence that the contract contemplated a payment for the exertion of personal and political influence upon members of the executive council, and that the services rendered were of that character. If that was the case the contract was, of course, void. But there was also testimony that Foley was employed simply as an ordinary salesman, because of his experience in using and buying paper and other material handled by the plaintiff, and that his efforts were in accordance with that employment, and were confined to exhibiting samples and "talking up" the goods and the responsibility of the house. If that was the case the contract was valid. In this aspect the question is merely one of fact, proper to be decided by a tribunal which sees and hears the witnesses.

The evidence suggested, but perhaps did not absolutely determine, that Foley's compensation was to be contingent upon the procuring of the state contract. There is a conflict of judicial opinion as to whether that circumstance should stamp the contract as illegal. In *Tool Company v. Norris*, 69 U. S. 45, it was said:

"Agreements for compensation contingent upon success suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception. There is no real difference in principle between agreements to procure favors from legislative bodies and agreements to procure favors in the shape of contracts from the heads of departments. . . . All agreements for pecuniary considerations to control the business operations of the government . . . are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements, and it closes the door to temptation by refusing them recognition in any of the courts of the country." (pp. 55, 56.)

In that case, however, it was plainly shown that the services for which a recovery was sought consisted in bringing personal and political influence to bear upon the public officers charged with the duty of letting a contract for the purchase of supplies for the government. The language quoted was obviously used with that fact in mind. Substantially the same thing was said in the recent case of *Russell v. Courier P. & P. Co.,* 43 Colo. 321, 95 Pac. 936. But there too the contract involved was clearly bad upon other grounds than that it provided for contingent compensation. We find no case in which an agreement to pay for services in selling goods to a public body, which was found to be otherwise fair and unobjectionable, has been held void because payment was to be made only in the event of a sale being effected. If the fact that payment is made to depend upon results renders such an agreement void, it must be because the salesman who has a pecuniary interest in the success of his efforts will be presumed to resort to methods which he would otherwise avoid. This is recognized by a text-writer in these words:

"We know the sinister influences that are being constantly employed and that willing ears are lent to corrupt propositions; and when men have every motive for the advancement of such propositions, it is safe to say that any contract which leaves an opportunity for the tender of such propositions can not be too forcibly condemned. Let men who seek dealings with the government employ men who are prompted by no motives except the desire to fulfill their duty. The inconvenience attending such a restriction is so much counterbalanced by the obvious benefits that the seeming injustice has no place worthy of notice." (Greenhood, Public Policy, p. 365.)

That test, however, seems to be repudiated in *Oscanyan v. Arms Co.,* 103 U. S. 261, where stress is laid upon the question, not whether the amount of compensation depends upon the result, but whether it is unusual or excessive, the court saying:

"And here it may be observed, in answer to some

authorities cited, that the percentage allowed by established custom of commission merchants and brokers, though dependent upon sales made, is not regarded as contingent compensation in the obnoxious sense of that term, which has been so often the subject of animadversion by this court, as suggesting the use of sinister or corrupt means for accomplishing a desired end. They are the rates established by merchants for legitimate services in the regular course of business." (p. 276.)

The fact that the compensation of a salesman, employed to sell goods to the public, depends upon his success may tend to show a purpose to use illegal means, or a probability that such means will be used, but we do not think that it should be regarded as conclusive on either point, nor that in and of itself it should be deemed to characterize the employment as illegal. (*Paving Co. v. Botsford*, 56 Kan. 532, 44 Pac. 3; *Howland v. Coffin*, [N. Y. Supr. Ct.] 47 Barb. 653; *Bergen v. Frisbie*, 125 Cal. 168, 57 Pac. 784; *Beal v. Polhemus*, 67 Mich. 130, 34 N. W. 532; *Stanton et al. v. Embrey, Administrator*, 93 U. S. 548.) We believe this view accords not only with sound reason, but with what has actually been decided by the courts. Cases bearing more or less directly on the matter are collected in various textbooks and notes. (15 A. & E. Encycl. of L. 974; 9 Cyc. 490; 121 Am. St. Rep. 726; 6 A. & E. Ann. Cas. 218; 4 L. R. A., n. s., 213.) Many of the cases in these collections involve contracts for influencing legislation, which are not entirely analogous to those for the sale of goods, and may well be regarded as subject to a more stringent rule.

Foley testified that he talked with a member of the executive council, showed him the samples, and went over the matter with him so that he would understand the questions that would come up. That these representations were made to an individual instead of to the council as a body might afford a reason for believing that illegal methods were pursued, but does not of itself

compel that conclusion.  To give information regarding a proposed contract to one of several members of a board charged with the letting of it is a means of getting the information before the board, and does not necessarily imply secrecy or concealment.

The judgment is reversed and a new trial ordered.