[File No. 6992]

W. GRAHAM GLASS, Appellant, v. SWIMASTER CORPORATION, a Corporation, Respondent.

(21 NW2d 468)

Opinion filed January 22, 1946

*Bangs, Hamilton & Bangs,* for appellant.

*Day, Lundberg & Stokes,* for respondent.

MORRIS, J. This is an appeal from a judgment rendered in favor of the defendant, dismissing plaintiff's cause of action on the ground that the contract sued upon is against public policy and is, therefore, null and unenforceable.

The complaint sets forth that between May 11, 1940, and August 11, 1942, the plaintiff rendered services for the defendant at its request in securing Navy Contract No. 92925 for certain merchandise manufactured and sold to the United States Navy whereby the defendant was paid the sum of $80,850.00. It is then alleged that the defendant promised to pay the plaintiff for these services, five per cent of the total amount of the contract, or the sum of $4,042.50 which the plaintiff seeks to recover together with interest and costs.

The defendant's answer sets up what amounts to a general denial and the further defense that the contract pleaded is void as being against public policy. The record presents two major

questions; was there a contract for the payment of a five per cent commission on the amount received by the defendant pursuant to Navy Contract No. 92925, and, if there was such a contract, was it void as being against public policy. The trial court found that there was such a contract but that it was unenforceable. The case was tried to the court without a jury and comes here for trial de novo.

There was no formal written contract. Most of the communications between the plaintiff and defendant were by correspondence. The plaintiff relies chiefly upon this correspondence to show that he had a contract for the payment of the commission. "An express contract is one the terms of which are stated in words." Section 9–0601, Rev Code 1943. The trial court, after a thorough analysis of the evidence as disclosed by his carefully prepared memorandum opinion, determined that there was an express contract supported by a consideration and that the contract applied to the transaction in question. The defendant argues that while the plaintiff did have a contract with the defendant by which the plaintiff was authorized to sell the product of the defendant on a five per cent commission to commercial buyers and to government departments in small quantities that this contract for a five per cent commission was not applicable to the contract made with the Navy Department, which is the basis of this suit and which was let through competitive bidding.

The product involved in this suit is a dual-type life belt sold under the trade name "Swimaster." The correspondence introduced in evidence shows that for some time prior to May 11, 1940, the plaintiff represented the defendant in connection with the sale of its product on a ten per cent commission basis. The defendant was then making a much lighter belt than was subsequently sold to the Navy. On that date plaintiff wrote to the defendant suggesting the possibility of selling the defendant's product to certain departments of the Federal Government. Over a considerable period negotiations were carried on with various departments for small orders and during that time various changes and improvements were made in the product.

During May, 1941, the parties worked together in preparing and submitting to the Navy Department a bid on a contract for which bids were to be opened June 17th. At about that time the plaintiff arranged for the services of Mr. Leyde who was leaving the employ of the Navy Department. On May 23rd, the plaintiff wrote to the defendant explaining that he needed five per cent additional commission for Mr. Leyde. This increase in commission was not agreed to by the defendant but it was agreed that the ten per cent commission was to be divided between the plaintiff and Mr. Leyde, five per cent to each. The arrangement applied to the contract with the Navy Department upon which the bid was being prepared. On July 5, 1941, the defendant was notified that its bid had been rejected "for the reason that you failed to furnish with your proposal a sample belt as required by the specifications."

The next contract to be let by the Navy was for fifteen thousand belts and arrangements were made between the defendant, the plaintiff and Mr. Leyde to bid on this contract. They were successful and the defendant obtained the contract, which constitutes the basis of this suit. Mr. Peterson, the President of the defendant Corporation, testified that after the first bid had been rejected by the Navy and before the contract in question came up he was in Washington and conferred with the plaintiff and Mr. Leyde and told them that he could not pay a commission on bid contracts but that their remuneration must be based upon reasonable compensation. However, on cross-examination his testimony is weakened somewhat by his uncertainty as to whether the conversation was personal or whether it was over the telephone from Grand Forks and whether he talked to the plaintiff or Mr. Leyde. At this point a letter written by Mr. Peterson to Mr. Leyde on February 21, 1942, becomes important. Contract 92925 had been let in October, 1941. At the time this letter was written deliveries were being made under it. The letter refers to these deliveries. Mr. Peterson then goes on to say:

"It is urgently necessary that both you and Mr. Glass take immediate action to see that we can secure further contracts.

With reference to your commissions on further contracts, I believe it is advisable that this be cut to 5%. I have gone into the matter with our Legal Department and I am of the opinion, after discussing it with them, that we may have some serious repercussions if we are to continue to pay 10% on Navy contracts. Undoubtedly, you are as familiar with this as I am and I should like to have your reaction as well as Mr. Glass' immediately."

The letter was marked "CC to W. Graham Glass" and a carbon copy was sent to the plaintiff.

The defendant argues that this letter does not refer to Contract No. 92925. We are unable to agree with this contention. It clearly constitutes an admission that up to that time the defendant had agreed to pay the plaintiff and Leyde ten per cent on Navy contracts, including the one involved in this lawsuit under which the defendant was at that time making deliveries to the Navy. We agree with the trial court that the evidence shows the defendant agreed to pay to the plaintiff a commission of five per cent on contracts for the sale of Swimaster Life Belts and that this agreement applied to the services rendered in connection with Navy Contract No. 92925.

The next question is whether the agreement under which the plaintiff seeks to recover for his services is against public policy and, therefore, void. According to the plaintiff's own evidence his compensation was a five per cent commission contingent upon a successful bid. The previous bid upon another contract had been rejected. With regard to his remuneration for assisting in the negotiations concerning the rejected bid, the plaintiff testified that Mr. Peterson, the President of the defendant Corporation, came to Washington on June 16, 1941, and met with the plaintiff and Mr. Leyde. At that time they figured out the bid to be submitted to the Navy. Mr. Peterson then agreed to pay the plaintiff and Leyde five per cent commission each on any contracts they obtained from the Government and the bid which they prepared contained the item of ten per cent commission. The plaintiff further testified that after the bid had been rejected, "We began to contact politicians, whom we

thought, could influence the Department." The bid for the contract involved in this lawsuit was made September 26, 1941. When the bids were opened the Swimaster Corporation's bid was the lowest but the contract was not awarded immediately. The plaintiff testified that he went to the office of a member of the United States Senate and asked him to call up a certain officer in the Navy Department "and tell him that he was interested in the Swimaster Corporation getting that award not only because it was the lowest bidder on schedule 8638 but because a representative of the Swimaster Corporation had introduced that belt to the Navy Department and he was a friend of mine." On October 1, 1941, this Senator wrote to the plaintiff as follows:

"I have contacted the Navy Department and I am advised that as is the usual procedure the samples furnished with your bid as well as by the other bidders, have been submitted to the Designing Section for inspection to see if they meet requirements. I am advised that if your sample meets the requirements there will be no question but what your firm will be awarded the contract."

On October 24, 1941, at the suggestion of the plaintiff, the President of the Swimaster Corporation wrote to the Senator thanking him "for the splendid cooperation you extended to us in securing this contract" and further stated that he was of the firm opinion that had it not been for the fine cooperation of the Senator to whom he was writing, as well as another Senator and an official of the State of North Dakota, "we would not have been successful in securing this contract."

The plaintiff had also contacted one of the North Dakota Senators in Washington and solicited his assistance in securing the contract in question. Mr. Peterson had written to the Governor of North Dakota seeking his cooperation and assistance. What, if anything, these officials did in connection with the matter does not appear. The correspondence clearly establishes that the plaintiff and the defendant, acting in concert, sought the exercise of political influence in behalf of this bid.

Mr. Leyde first appears in this record in 1940. At that time he was a commissioned officer in the Navy working in the Bu-

reau of Ships. He is described by Mr. Peterson as being very helpful to the Swimaster Corporation. He resigned about June 1, 1941. On May 23, 1941, the plaintiff wrote Mr. Peterson in part as follows:

"The item of 10% commission—the addition 5% that I am asking is what I am going to give Leyde for his work in getting it through the Department if we receive the order. I wrote Mr. Leyde yesterday, telling him that I had received your letters and that I will see him the first part of next week. At that time I am going to ask him if it is possible to get the lists from the Navy Department, which you speak of in the third paragraph of your letter of May 20th. . . . I hope that by next week we will get some real information, because by that time Mr. Leyde's leave will have expired and he will be off the payroll of the Navy Department."

The defendant's first contention with respect to the illegality of the contract is that the provision for compensation on a contingent basis stamps it as being against public policy.

While there is some authority to the contrary, we believe the better rule to be that an agreement providing for compensation upon a contingent basis to procure or assist in procuring a public contract is not rendered void as being against public policy by the contingent character of the promise of payment. 6 Williston, Contracts, Rev ed § 1729A. In Oscanyan v. Winchester Repeating Arms Co. 103 US 261, 26 L ed 539, it is said:

"It is legitimate to lay before the officers authorized to contract, all such information as may apprise them of the character and value of the articles offered, and enable them to act for the best interests of the country. And for such services compensation may be had as for similar services with private parties, either upon a quantum meruit, or, where a sale is effected, by the ordinary brokerage commission."

In Coyne v. Superior Incinerator Co. (CCA 2d) 80 F2d 844, the court analyzes a number of federal cases and reaches. the conclusion that:

"The prevailing rule to be gathered from the above cases is

that contingent agreements to endeavor to make sales to a governmental body are not offensive to public policy because of the mere possibility that sinister or corrupt influence may be used in the performance. There must be proof that something contrary to good morals was contemplated or done."

In that case agreements involving the sale, on commission, of incinerators to municipalities was upheld. Numerous authorities dealing with the point under consideration are cited in the following cases and notes appended thereto. Kansas City Paper House v. Foley R. Printing Co. 85 Kan 678, 118 P 1056, 39 LRA(NS) 747 and note, Ann. Cas 1913A 294, note 297. Old Dominion Transp. Co. v. Hamilton, 146 Va 594, 131 SE 850, 46 ALR 186, note on 196; Hall v. Anderson, 18 Wash2d 625, 140 P2d 266, 148 ALR 760, note 761. See also text and citations, 12 Am Jur 711, Contracts, § 207; 17 CJS, Contracts, § 214.

In further support of the contention that the contingent compensation renders this contract void as being against public policy, the defendant refers to the following paragraph contained in the contract between the defendant and the Navy Department, which reads as follows:

*"Covenant against contingent fees.*—The contractor warrants that he has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the right to annul the contract, or, in its discretion, to deduct from the contract price or consideration the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not apply to commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business."

This provision was incorporated in the contract pursuant to established governmental policy. (See Executive Order 9001, Code of Federal Regulations, 1941 Supplement, p 331.) We are dealing here with a question of public policy which may or

may not coincide with governmental policy as expressed in a contract or an executive order. While this provision does not determine what is contrary to public policy it is of some value as indicating a feeble attempt on the part of the Government to discourage the payment of commissions for obtaining government contracts.

The rule that meets with the approval of the majority of the courts passing upon the question is stated in Restatement of the Law, Contracts, as follows:

"Section 562. . . . A bargain to endeavor to secure a public contract by presenting to the official having power to make the contract inducements except such as relate to the desirability on public grounds of entering into the contract, is illegal; but if no influences other than these are bargained for, or contemplated, the bargain is not illegal. . . .

Section 563. . . . The fact that the compensation fixed in a bargain for efforts to secure legislation or official action is contingent on success, is not conclusive evidence that improper means are contemplated in securing the desired results."

The foregoing quotation intimates and we have no doubt but that it is proper to consider the fact of contingent compensation along with other facts and circumstances in determining whether the particular contract under consideration is violative of public policy. Kansas City Paper House v. Foley R. Printing Co. 85 Kan 678, 118 P 1056, 39 LRA(NS) 747, Ann Cas 1913A, 294, supra. In Noble v. Mead-Morrison Mfg. Co. 237 Mass 5, 129 NE 669, it is said that:

"The general principle fairly deducible from the decisions is that ordinarily no one factor is decisive in determining whether the contract concerning furnishing supplies to the government is void as contrary to public policy. Contingency of compensation upon success, percentage upon the amount involved in sales directly to the government, and the size of the fee, all are elements entitled to consideration. The words 'contingent compensation' in connection with a contract may be used either in an obnoxious or a harmless sense. The tenor of the contract may be such in connection with its setting as to stamp it with

invalidity. If it bears any badge of fraud, either covertly or openly, it must be stricken down. The question of the legality of the contract in each case is to be determined by weighing all the elements involved and then deciding whether its inherent tendency is to invite or promote the use of sinister or corrupt means to accomplish the end or to bring influences to bear upon public officials of any other nature than the single one of genuine advantage to the government. If such is its tendency, it must be pronounced illegal."

This language is quoted with approval in Hall v. Anderson, 18 Wash2d 625, 140 P2d 266, 148 ALR 760, supra, and Stone v. William Steinen Mfg. Co. 22 NJ Mis R 353, 39 A2d 241. In applying these principles to plaintiff's cause of action we find that he seeks a five per cent contingent commission on the amount involved in Navy Contract No. 92925; that the contract thus procured contains a covenant against such fees. In addition to these factors it appears that the parties contemplated and actually attempted the exercise of both personal and political influence upon the Navy Department in an effort to secure the contract. They procured the services of Mr. Leyde with whom they had been dealing as a Naval Officer while he was performing duties in connection with the type of contract that the defendant corporation was seeking to obtain. The dubious credit for his employment is claimed by both the plaintiff and the President of the defendant corporation. When one bid was rejected the parties began to contact politicians who they thought could influence the Navy Department. In carrying out the plan of contact the aid of two United States Senators was sought. This act has sinister implications. Congress, through the medium of appropriations, provides funds with which the Navy Department operates and pays its personnel. It follows that the pleasure of the members of Congress is of considerable moment to that personnel. The intervention of members of Congress in the affairs of executive departments in behalf of individuals and firms seeking to deal with the Government on a contract basis is, as a matter of general policy, inimical to the public interest and against public policy. This court has said:

"Public policy means the public good. It is 'that principle of law which holds that no subject or citizen can lawfully do that which has a tendency to be injurious to the public or against the public good.'" Ness v. Fargo, 64 ND 231, 251 NW 843.

In the opinion of the writer solicitation of interference in departmental affairs by members of the Senate in the manner disclosed by this record has a further deleterious effect. It deflects the energy and attention of the nation's legislators from their public duties and tends to reduce them to the role of chore boys for private interests.

The agreement upon which the plaintiff seeks to recover, when considered in the light of its construction and performance as disclosed by the plaintiff's own evidence, is contrary to public policy and, therefore void. The judgment appealed from is affirmed.

CHRISTIANSON, Ch. J., and BURR and BURKE, JJ., concur.

NUESSLE, J., concurs in the result.