ANTHONY TSCHIRGI and RUTH TSCHIRGI BERRY, appellants, v.
MERCHANTS NATIONAL BANK OF CEDAR RAPIDS, as executor
of will of Grace F. Tschirgi, deceased, appellee.

No. 50497

FEBRUARY 6, 1962.

Simmons, Perrine, Albright, Ellwood & Neff, of Cedar Rapids, for appellants.

Elliott, Shuttleworth & Ingersoll, of Cedar Rapids, for appellee.

LARSON, J.—This is a suit for specific performance of the optional provisions of a contract of settlement negotiated between the plaintiffs and defendant's decedent as a result of a dispute at the time of closing of the estate of plaintiffs' father. Defendant resisted on the grounds that (1) plaintiffs had breached the contract of settlement (2) had failed to allege and prove essential elements of such a suit, and (3) were guilty of such illegal and unconscientious conduct that it would be inequitable to grant specific performance herein. The trial court upheld the third ground, holding agreements subsequently executed by plaintiffs relating to the control and operation of the corporation were illegal and against public policy to such a degree that it would not grant plaintiffs relief. We do not agree with that conclusion.

As in most cases involving questions of good faith and conscience, a rather detailed statement of the facts is required. Plaintiffs, Anthony Tschirgi and his sister, Ruth Tschirgi Berry, heirs of Anthony Tschirgi, deceased, filed objections to the final report in their father's estate. Their stepmother, Grace F. Tschirgi, was one of the executors, and in an effort to settle the dispute relating to a proper accounting for property left by their father, an agreement was reached between Grace and the plaintiffs wherein she paid these heirs additional sums of money, conveyed to them certain real estate, and gave them each an option to purchase, at her death, 7¾ shares of stock in Russell's Guides, Inc. at a stipulated figure.

After her husband's death Grace owned 45 of the total 50 shares issued by the corporation, and prior to her death December 18, 1957, she sold one share to another son of Anthony, Sr., Paul, and 12½ shares to Edward R. Pohl, now deceased, the son of Mrs. Emma Pohl, a party to the agreements to be considered herein. Thus at the time of her death Grace Tschirgi left 31½ shares of stock, 15½ of them committed under the

option to plaintiffs. While 31½ shares is a controlling interest, it is evident that if the option is enforced, her estate will no longer have that control. In fact, no one party will have it. This situation gave rise to the agreements between the plaintiffs and Mrs. Pohl which the defendant contends are illegal and void as against public policy.

Prior to her death Grace Tschirgi, an inactive vice president and director in the corporation, applied for a voluntary guardianship, and in the inventory appeared some $137,010 of assets kept in a lockbox in a St. Louis, Missouri, bank. Plaintiffs, discovering this fact, brought an action for damages against Grace alleging fraud and deceit in failing to disclose that sum as assets of their father's estate and procuring a settlement without disclosing these facts. She defended alleging settlement by the agreement here involved, but neither party asked for rescission of that agreement. Grace died before that case was assigned for trial, and defendant herein, as her executor, took over the defense. It was dismissed without prejudice prior to trial, but defendant contends by bringing that action plaintiffs breached the settlement contract and cannot now enforce it in equity.

I. The trial court properly held plaintiffs could elect to retain what they received and sue for the difference, which in this case would have been their share of any of the newly-discovered funds that were found to belong to the estate of Anthony Tschirgi, Sr. Lamasters v. Springer, 251 Iowa 69, 99 N.W.2d 300. A purchaser of personal property may retain that which has been purchased and sue for additional damages for alleged fraudulent misrepresentation. Hanlon v. Macfadden Publications, 302 N. Y. 502, 99 N.E.2d 546, 24 A. L. R.2d 733.

It is clear to us, as it was to the trial court, that there was no failure of consideration in the settlement contract and, when that action was dismissed, Mrs. Tschirgi and the estate had received substantially all the benefits bargained for from the plaintiffs. The estate was settled pursuant to the withdrawal of the objections by plaintiffs as agreed in the settlement. It would not be equitable to retain all the benefits and deny plain-

tiffs a right to specific performance on that ground. Here, as in Bayley v. Lewis (1951), 39 Wash. 2d 464, 236 P.2d 350, relied upon by the trial court, the alleged breach had been terminated before trial. There is language therein indicating that if the breach continued up to the time action was brought, specific performance would have been denied. Although a party cannot enforce specific performance of a contract while in default of its terms, it would seem just that any time before trial he may purge himself of his default and thus remove that bar to equitable relief. We find no cause on this ground to deny plaintiffs the relief prayed.

II. Defendant urges that, due to certain agreements between the plaintiffs and Mrs. Pohl and between those parties and Mr. Floyd Sortor, equity will refuse to grant specific performance of this otherwise legal option to buy. This plaintiffs contend is error, and under the circumstances revealed we must agree. We have carefully read most of the authorities cited by both able counsel and do not find a case on all fours with this one.

Cases where an agreement between the parties is challenged by a contracting party are not in point. Here we find two agreements which are in effect at the present time. They do not involve defendant as a minor stockholder except as they would tend to injure the corporation and its business affairs. They were executed in an effort to secure continuity of the present policies of the corporation, and as announced therein, to foster the "best interests of Russell's Guides, Inc." and to see that the management policies will not be changed. All parties and the trial court seem to agree that the purpose and intent of such agreements is controlling in such cases. We carefully consider it here.

Under the settlement agreement the plaintiffs' cost of the 15½ shares was $108,243.78. Evidently the lender of this sum required certain safeguards for such a loan, including assurances that the successful business policies of the corporation remain the same. Apparently some such arrangement was reached with Mrs. Pohl and a Cedar Rapids bank, which was thereafter reduced to writing on January 20, 1958, and became

Exhibit H. This agreement was later amended and revised in Exhibits I and J dated July 30, 1959. Exhibit K was the agreement with Floyd Sortor dated May 13, 1958. Apparently it was part of the arrangement for the loan attending the exercise of the option.

The trial court found, and we agree, that Exhibits H and I were revised into Exhibit J and only Exhibits J and K were effective at the time of trial. Examination of Exhibits H and I reveals no facts which aid or diminish defendant's contention that these agreements were a breach of fiduciary relationship, illegal as against public policy and void, or were unconscionable and disclosed bad faith toward the corporation or other stockholders.

Our attention is called to these provisions in Exhibit K signed by Floyd Sortor, Anthony Tschirgi, Emma Pohl, and Ruth Berry:

"Floyd Sortor's position will be the same in the future except he will be in complete charge of all negotiations with Greyhound and will be President and Chairman of the Board of Directors.

"Anthony Tschirgi will go to work in Russell's Guide as Floyd Sortor's Assistant and be Vice President; Mrs. Emma Pohl also will be Vice President.

"There will be no change in the management policies of the Russell's Guide without Sortor's approval. Any action taken will be for the best interests of the business."

The reference to "Greyhound" is to Greyhound Bus Lines, principal customer of Russell's Guides, Inc. Sortor was then president of the corporation.

Exhibit J, signed by the plaintiffs and Mrs. Emma Pohl, provides that plaintiffs will pledge the 15½ shares as collateral for a purchase money loan, will sell four shares to Mrs. Pohl at their purchase price, that as long as plaintiffs are indebted on their loan they will direct that their dividends be paid to the lender on the indebtedness, with the exception of $2500 per year to Anthony, and that they will give a proxy to Mrs. Pohl to vote all shares owned by them, the same to be released, at the rate of one vote for each $7000 paid by plaintiffs on the loan principal. It further provides that upon approval of the lender,

Mrs. Pohl may vote to redeem the shares of other outstanding shareholders, and in event of such redemption those stocks shall not be entitled to a vote or receive dividends until the debt of plaintiffs is paid, and that in event of plaintiffs' default on the debt payments Mrs. Pohl has an option to purchase one share of stock from them at $7000 per share and apply that sum on the debt. No compensation for services by the parties other than director fees as long as plaintiffs are indebted shall be allowed except by written consent of all. The agreement then provides:

"6. After Second Parties [plaintiffs herein] have repaid their indebtedness * * * [the parties] * * * agree to assume control of and to vote their respective shares of stock in concert with each other, said voting power to be exercised for the best interests of Russell's Guides, Inc. and for the continued success of the business of that company. First Party and Second Parties may each designate and elect an equal number of directors to serve on the Board of Directors. One additional director who shall be an officer of the Peoples Bank and Trust Company shall be nominated by Peoples Bank and Trust Company and First and Second Parties shall so vote their shares as to elect the person so nominated to serve as a director of Russell's Guides, Inc. This provision for joint control of Russell's Guides, Inc. may be terminated by the First Party [Mrs. Pohl] or in the event of her death or incapacity by Robert L. Pohl or by Second Parties effective six months after written notice is given to the other parties."

Other provisions relate to options to buy the other parties' shares in case either wishes to sell, and the right to buy equally any shares offered to either by present stockholders, obviously intended to retain a balance of control between these parties.

It is defendant's contention that due to these provisions the agreements are illegal and void, that by the weight of authority and by our own decisions (Clark v. First National Bank, 219 Iowa 637, 259 N.W. 211, and Northern Lumber Co. v. White, 250 Iowa 801, 804, 96 N.W.2d 463), such agreements are invalid as an attempt to control the action of the board of directors and a breach of fiduciary relation toward the corporation and the minority stockholders.

The trial court so found, and from such finding concluded plaintiffs were guilty of constructive fraud sufficient to deny the prayer for specific performance. The trial court, however, was convinced, as we are, that the circumstance revealed did not amount to actual fraud, saying, "The court does not wish to be understood as saying that the plaintiffs, Mrs. Pohl and Mr. Sortor deliberately did an illegal or fraudulent act. * * *."

Thus we have before us two questions of some import. If the evidence including the agreements does not disclose a wrongful purpose, or acts designed to damage the corporation or injure the other stockholders, should equity deny the right of specific performance under a valid and legal option to buy stock? And if the objects and purposes of the agreements could be legally accomplished, are they so violative of fiduciary relationship or public policy as to justify their classification as constructive fraud?

III. Where a contract is made for a consideration and without fraud and is entered into fairly and understandingly between parties who are competent to contract, a court of equity will enforce it as a matter of right if there is no adequate remedy at law. Searle v. Hill, 73 Iowa 367, 35 N.W. 490, 5 Am. St. Rep. 688; Bjornstad v. Fish, 249 Iowa 269, 279, 87 N.W.2d 1, and citations; 49 Am. Jur., Specific Performance, section 130, page 153; 130 A. L. R. 929. The granting of specific performance of such a contract is not a matter of caprice on the part of a chancellor. Cohen Brothers Iron & Metal Co. v. Shackelford Brick Co., 197 Iowa 674, 687, 198 N.W. 318, 324.

It is nevertheless true that a court of equity will not lend its aid in carrying out an unholy purpose. Where the evidence discloses an active conspiracy to damage the corporation or injure the other stockholders, relief will not be granted even though the relief asked is not illegal. Funck v. Farmers' Elevator Co., 142 Iowa 621, 121 N.W. 53, 24 L. R. A., N. S., 108. In the Funck case the evidence clearly disclosed bad faith and an active conspiracy. In the later case of Post v. Null, 183 Iowa 760, 166 N.W. 459, the court found no evidence of a conspiracy or preconcerted plan or arrangement to injure or destroy the business and a writ was issued compelling the

transfer of certain shares of stock. In both of these cases the good faith of the petitioner was found to be the controlling factor.

There is nothing in this record to indicate plaintiffs' purpose was to injure the corporation, its business, or the value or return on the stock held by others. In fact, it is quite clear they desired that the successful business practices and policies continue and took pains to so provide. The present management with its skill and knowledge was to be retained. The effort was to avoid unwise changes. More is required for a defense to such an action as this than a suspicion or surmise that these parties plan by joint control to mismanage and damage the corporation or the stockholders' interests. It was defendant's burden to show as its affirmative defense a wrongful purpose other than a possible technical violation of corporate laws in order to justify a court of equity's denial of relief herein. This we think it has failed to do.

IV. We are not convinced the agreements are illegal. The element of illegality must be of such a nature that to enforce or recognize a transaction tainted thereby would be clearly contrary to public policy and welfare. There is obviously a distinction between the violation of public policy and constructive fraud. The former is against the state policy, while the latter operates between individuals. A possible violation of public policy does not necessarily result in a constructive fraud, as the trial court seemed to believe. Generally it requires much more to establish a constructive fraud. We find no substantial evidence of such fraud against defendant here and do not believe every type of illegality requires such court intervention for the preservation of public policy. Morello v. Levakis, 293 Mass. 450, 452, 200 N.E. 271, 273. It is not the court's function to curtail the liberty to contract by enabling parties to escape their valid contractual obligation on the ground of public policy unless the preservation of the general public welfare imperatively so demands. Twin City Pipe Line Co. v. Harding Glass Co., 283 U. S. 353, 51 S. Ct. 476, 75 L. Ed. 1112, 83 A. L. R. 1168; 5 Williston, Contracts, Rev. Ed., section 1630A; 12 Am. Jur., Contracts, section 172.

We ourselves have dealt extensively with this question. In Cole v. Brown-Hurley Hardware Co., 139 Iowa 487, 491, 117 N.W. 746, 748, 18 L. R. A., N. S., 1161, 16 Ann. Cas. 846, we quoted from Richmond v. Dubuque & Sioux City R. Co., 26 Iowa 191, 202, as follows: "* * * the power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." We pointed out the general acceptance of that truth in other states, and said so long as the so-called corrupting "character of the agreement is not so clear as to be readily apparent to the intelligent and impartial mind, the just principles of the law, which hold every man to a fair and full performance of his contract, ought not be made to yield to any doubtful construction of that somewhat variable and altogether undefined thing which we call public policy."

Unless fraud is evident in those agreements there will be time enough later to determine their validity when and if an actual violation occurs. The courts are always open to restrain an illegal act involving the corporation and its stockholders.

Defendant contends the provisions of agreements J and K, before set out, tend to divest the directors and officers of their right and duty to exercise independent judgment and discretion in determining corporate policy and action, and are therefore illegal and void. It is true we held in Clark v. First National Bank, supra, 219 Iowa 637, 259 N.W. 211, that an agreement between stockholders to provide certain persons a position in the corporation was not valid because even if these stockholders were in control they could not control official action of the board of directors. While this may have been the old rule throughout the land and in Iowa, we note that it was not necessary to that decision and that it should not be applied under all circumstances. To that extent we must modify our former position. For good discussions of these trends, see Comments in Volume 46 Iowa L. Rev., pages 146 to 151 inclusive, with citations, and an article by C. J. Lynch presented at the Iowa Legal In-

stitute October 2, 1959, on Control and Management of Corporations.

▮ Where the contract involved permits construction of illegality or of legality, in the absence of proof of a purpose to the contrary, an intended contractual course of legality is to be presumed. Hart v. Bell, 222 Minn. 69, 23 N.W.2d 375, 379. Therein it is pointed out, as here, the contracting parties did not stipulate for the election of dummy directors to act as they were told. Their power and authority were not curtailed. Only an expression of a good and worthy purpose clearly appears.

It is not controlling that under these agreements the parties would be in position to elect directors of their own choosing. No effort is made to curtail their board's right to discharge present personnel nor to change business policies. Sortor could be discharged if he did not assent to changes deemed necessary by the board of directors. The effect of the agreement with Sortor was merely an assurance that for the present the successful practices and policies would be continued. Such statements in these contracts we construe, as did the Minnesota court, as merely a declaration of desirable corporate policy.

It would be unjust to impose upon the parties an intent to use unlawful means to achieve a justifiable objective when lawful means were available. The plaintiffs and Mrs. Pohl would own and control a majority of the common stock and would, of course, be in a position to select and elect directors friendly to corporate policies they favor without making any effort to throttle the directors' official discretion. We do not assume a contract to do lawful acts is unlawful or amounts to a constructive fraud on other stockholders. Brightman v. Bates, 175 Mass. 105, 110, 55 N.E. 809, 810.

▮ Illegality per se is no longer the inevitable consequence of every agreement by a majority of stockholders without regard to its purpose or effect. 46 Iowa L. Rev. 146; 21 Minn. L. Rev. 103; 66 U. S. L. Rev. 562, 566, and cases cited; 5 Fletcher, Cyc. Corp., Perm. Ed., section 2064, pages 194–196; 13 Fletcher, Cyc. Corp., Perm. Ed., section 5743, pages 48, 49. It is now generally recognized that an agreement by a number of stockholders to combine their votes to effectuate a particular policy is not of

itself unlawful in the absence of an intent to defraud the other stockholders or to secure a private benefit at the expense of the corporation or the other stockholders.

As before stated, there is no evidence of any intent to defraud the other stockholders or to secure a private benefit at the expense of the corporation or its other stockholders. In fact, no salaries were specified for any proposed officers, no term of office was stated. Anthony testified he would not be available for employment as he was now in business in Florida. We find in the agreements only a declaration of policy and a reasonable desire to safeguard the present successful operation of the corporation to assure payment of the loan necessary to finance the share purchase.

What we have said disposes of the contention that plaintiffs did not come into equity with clean hands.

V. Other issues need only brief mention. We find no merit in defendant's contention that plaintiffs failed to keep their tender alive. As pointed out by the trial court, a valid tender was first made by cashiers check and thereafter renewed by letters. Defendant made no demands under chapter 538 for the money, and no default of plaintiffs to make payment appears.

VI. We are aware of the discretion resting in the trial court in matters of this kind. We also note this discretion is not an arbitrary one (3 Pomeroy, Equity Jurisprudence, section 1404), and since we find no legal or valid reason why this contract involving stock in a closed corporation should not be enforced, we are satisfied the option agreement should be carried out as agreed. The stock cannot be purchased on the market, and control of the corporation is evidently at stake. It is, therefore, ordered that defendant, as executor of the will of Grace F. Tschirgi, deceased, accept the sums tendered from plaintiffs and convey to each seven and three-fourths (7¾) shares of common stock in Russell's Guides, Inc., as provided in the option agreement between the parties.—Reversed.

All Justices concur except Thompson, J., who takes no part.