**Mike JOHNSON, Plaintiff
and Appellant,**

v.

**PETERBILT OF FARGO, INC.,
Defendant and Appellee.**

Civ. No. 880149.

Supreme Court of North Dakota.

March 27, 1989.

Robert A. Feder, of Yuill, Wold, Johnson & Feder, P.C., Fargo, for plaintiff and appellant.

E. Jane Sundby (argued) and Bruce H. Carlson, of Lamb, McNair, Larson & Carlson, Ltd., Fargo, for defendant and appellee.

VANDE WALLE, Justice.

Mike Johnson appealed from a judgment dismissing his action against Peterbilt of Fargo, Inc., for recovery of commissions earned while he was employed by the defendant. The only issue on appeal is whether a clause in the contract between the two parties is against public policy.[1] Because we conclude that it is not, we affirm.

Peterbilt is a corporation engaged in the business of selling and repairing trucks, tractors, and trailers. Johnson was employed as a salesman for Peterbilt from April of 1984 through October of 1985.

The parties entered into a contract on January 21, 1985.[2] That contract specifies, in part:

"COMMISSIONS WILL NOT BE PAID TO SALESMEN UNDER THE FOLLOWING CONDITIONS:

.   .   .   .   .

"6. ON SALES WHERE THE UNIT OR UNITS ORDERED IS DELIVERED AFTER THE TERMINATION OF SALESMAN'S EMPLOYMENT, WHETHER SUCH TERMINATION BE VOLUNTARY OR OTHERWISE."

Johnson sold two trucks for which he did not receive commissions. One sale occurred in August 1985 and the other took place in September 1985.[3] The total commission he claimed due was $4,128.68. Peterbilt refused to pay any commissions because Johnson quit his job before the units sold were actually delivered.

The trial court found that Johnson failed to show that the provision in the contract was unconscionable or constituted unjust enrichment or involuntary servitude. It also found that Section 34-03-09, N.D.C.C., provided no relief for Johnson because the contract specified that no commissions would be due until the units were delivered; and since Johnson voluntarily terminated his employment prior to delivery, no commissions were owed under the contract.

On appeal, Johnson argues that "[a] contractual provision which states that no commission will be paid to a salesman on sales where the item is delivered after the termination of the salesman's employment whether such termination is voluntary or otherwise is void as a matter of public policy."

Peterbilt counters that Johnson is an experienced salesman and willingly subjected himself to the terms of the contract; thus there was no overreaching by Peterbilt.

■ Public policy, with respect to contract provisions, is a principle of law whereby a contract provision will not be enforced if it has a tendency to be injurious to the public or against the public good. *Ness v. Fargo*, 64 N.D. 231, 251 N.W. 843 (1933). Whether a particular provision is against public policy is generally provided for by statute[4] or by the State Constitution.

1. Although the trial court analyzed the issues in terms of unconscionability, unjust enrichment, and involuntary servitude, all of which involve the issue of public policy, the issue on appeal is framed generally, i.e., whether the provision challenged in this case is void as against public policy.

2. There was some dispute as to whether a written contract was entered into at the time Johnson was hired. Whether or not a contract was entered into at an earlier date is irrelevant because the contract dated January 21, 1985, states, "This agreement automatically terminates and cancels all prior agreements between the parties."

3. Another sale took place around May 14, 1985, but Johnson did not pursue a claim for commission because the truck was repossessed.

4. See, e.g., *Krein v. Marian Manor Nursing Home*, 415 N.W.2d 793 (N.D.1987) [retaliatory discharge of employee for seeking workers compensation violated public policy expressed by Legislature in Section 65-01-01, N.D.C.C.].

However, when a contract provision is inconsistent with fair and honorable dealing, contrary to sound policy and offensive to good morals, courts have the authority to declare the provision void as against public policy. Sec. 9–08–01, N.D.C.C. See also *Mees v. Grewer*, 63 N.D. 74, 245 N.W. 813 (1932).

■ When a court is faced with deciding whether a contract is against public policy, it must also be mindful of an individual's right to enter into a contract. "It is not the court's function to curtail the liberty to contract by enabling parties to escape their valid contractual obligation on the ground of public policy unless the preservation of the general public welfare imperatively so demands." *Tschirgi v. Merchants National Bank of Cedar Rapids*, 253 Iowa 682, 690, 113 N.W.2d 226, 231 (1962). [Citations omitted.] See also *Walker v. American Family Mutual Insurance Co.*, 340 N.W. 2d 599 (Iowa 1983).

■ Johnson relies upon Section 34–03–09 [5] for the proposition that, as a matter of public policy, whenever a person works on a commission basis he is unconditionally entitled to a portion of the profits on sales he makes. We do not read that section to so narrowly limit the parties' right to contract. Section 34–03–09 superseded Sections 34–03–07 [6] and 34–03–08.[7] It appears that the Legislature, in adopting Section 34–03–09, did not intend to limit the rights of persons to contract as they desire; rather, it merely sought to reverse the law that provided no compensation was due to an employee who was dismissed for good cause. Thus Section 34–03–09 does not limit the parties' right to agree if and when commissions are due; nor does it establish

an absolute policy that compensation is due whenever any amount of work, no matter how minuscule, is performed.

Johnson suggests that this would be the only State in the Union to recognize that, even if the employee has partially performed his job, the parties can agree that commissions will not be due until after a unit has been delivered. But our research does not support that suggestion. See, e.g., *Powis v. Moore Machinery Co.*, 72 Cal.App.2d 344, 164 P.2d 822 (Cal.Dist.Ct. App.1945); *Division of Labor Standards Enforcement v. Dick Bullis, Inc.*, 72 Cal. App.3d Supp. 52, 140 Cal.Rptr. 267 (Dep't Super.Ct.1977); *Fox v. Don Siebarth Pontiac, Inc.*, 458 So.2d 575 (La.Ct.App.1984).

In *Powis*, a salesman for Moore Machinery Company brought an action for declaratory relief and for money due as commissions. The parties had a contract which stated that the salesman was to receive commissions "when and if the goods are actually delivered to the customer, when they have been invoiced and paid for in full; when the goods are sold on a conditional sale contract and the company has received a down payment and protection against loss, commissions will be paid; ..." 72 Cal.App.2d at ——, 164 P.2d at 823–824. In finding that the contract was not void as against public policy, the court stated:

"The provision therein to the effect that if plaintiff should quit voluntarily he should be paid 1% [instead of 2% had he still been employed with the defendant] as commission on goods which were undelivered and unpaid for was not a provision for liquidated damages. Plaintiff would not thereby be deprived of any sums which he had already earned since

entitled to any compensation for services rendered since the last day upon which a payment became due to him under the contract."

**5.** That section provides: "An employee who quits the service of his employer for good cause and an employee who is dismissed by his employer for good cause are entitled to such proportion of the compensation which would have become due upon full performance of the contract of employment as the services already rendered by such employee bear to the services he was obligated to render had the contract of employment been fully performed."

**6.** Section 34–03–07 provided: "An employee dismissed by his employer for good cause is not

**7.** Section 34–03–08 provided: "An employee who quits the service of his employer for good cause is entitled to such proportion of the compensation which would become due in case of full performance, as the services which he has already rendered bear to the services which he was to render as full performance."

it related to services to be performed in the future.... It was not illegal to provide that commissions would be paid when and if the goods were delivered and paid for.... Undoubtedly, it was a motive of defendant in placing that provision in the contract to create an incentive for plaintiff to remain with the company, but such motive did not make the contract illegal.... Plaintiff was free to accept or reject the proposed terms of payment." 72 Cal.App.2d at ——, 164 P.2d at 827–828.

In *Division of Labor Standards Enforcement v. Dick Bullis, Inc., supra,* a case similar to the present one, a car salesperson brought suit against her former employer to recover commissions due. A provision of their contract stated, "No commissions, bonuses, or contest prizes will be payable to a salesman under any conditions for any unit not actually physically delivered and licensed prior to termination of employment." The salesperson sold seven vehicles but voluntarily terminated her employment prior to the time the cars were delivered. In finding that the contract was not void as a contract of adhesion or a penalty provision, the court stated:

> "[T]he salesperson in the instant case had duties to be performed after delivery of the vehicle. She had to be certain that the car was in good condition; she had to test drive the car; she had to supervise the customers' signing of papers, etc. In addition, there was the further possibility that a customer would ultimately reject a vehicle that he had ordered. Appellant was free to accept or reject employment with respondent." 72 Cal.App.3d Supp. at 58, 140 Cal.Rptr. at 270.

The court concluded that the right to recover a commission must be measured primarily by the terms of the contract. Likewise,

the trial court in the present case found that much work needed to be done at the time the trucks were delivered to the buyer. The trucks had to be inspected in order to confirm that they met the requirements of the orders. The salesperson was expected to correct or make adjustments for any deficiencies found. He was also to be involved in financing the sale of the trucks. Thus requiring a salesman to complete his job prior to being paid is not unreasonable. See also *Fox v. Don Siebarth Pontiac, Inc., supra* [it is not uncommon in the automobile sales industry for entitlement to a commission to be .considered earned only when the sale is completed].

The contract provision at issue in this case is not against any stated public policy. Nor, under the facts of this case,[8] is it so offensive that it is inconsistent with fair and honorable dealing, or contrary to sound policy, or offensive to good morals. While it is true that Johnson apparently consummated the sale of the two trucks, he agreed in the contract that should his employment with Peterbilt terminate prior to delivery of the trucks, he would not be entitled to a commission. Johnson was an experienced salesman. He entered the contract with knowledge of its terms and without objection. The mere fact that he can show an injury flowing from Peterbilt's exercising its contractual rights does not compel this court to devise some basis for relief. *Minneapolis Threshing Machine Co. v. Hocking,* 54 N.D. 559, 209 N.W. 996 (1926). To do so would undermine the parties' right to bargain and impair their right to contract as they wish.

The judgment of the trial court is affirmed.

ERICKSTAD, C.J., and GIERKE, JJ., concur.

---

**8.** Our decision is limited to the facts of this case. We do not decide, for example, whether or not we would hold the clause contrary to public policy if an employee who has made several sales for which delivery is due is dismissed without cause [see, e.g., *Reed v. Kaydon Engineering Corp.,* 38 Mich.App. 353, 196 N.W.2d 487 (1972); nor, for example, do we decide whether or not the clause would be contrary to public policy in the case of an adhesion contract, i.e.,

the instance in which the employee is the weaker party and has no realistic choice as to the terms of the contract. Here, the facts as found by the trial court reflect that Johnson left his employment voluntarily for another job, that the terms of the contract, including the clause in question, were discussed with Johnson by Peterbilt's manager, and that Johnson did not object to any of the terms of the agreement.

MESCHKE, Justice, dissenting.

Mike Johnson was a salesman for Peterbilt of Fargo, Inc. Their written "Salesman's Compensation Agreement" said:

"THE SALESMAN AGREES TO DEVOTE HIS FULL TIME AND SERVICES TO THE COMPANY IN THE CAPACITY OF SALESMAN.

\* \* \* \* \* \*

"COMPENSATION

"THE COMPANY WILL PAY AND SALESMAN WILL ACCEPT AS THE ENTIRE COMPENSATION FOR SERVICES TO BE PERFORMED AS FOLLOWS:

"*NEW AND USED—TRUCKS, TRAILERS, & GLIDER KITS*

"10% OR MORE GROSS PROFIT = 30% OF GROSS PROFIT

"0%—9.99% GROSS PROFIT = 25% OF GROSS PROFIT

"ALL THE ABOVE PERCENTAGES WILL BE COMPUTED FROM *TOTAL* COST (TOTAL COST TO INCLUDE FREIGHT AND SERVICE SCHEDULES PER ATTACHED SCHEDULE 'A')."

Their 4-page agreement also said:

"COMMISSIONS WILL NOT BE PAID TO SALESMAN UNDER THE FOLLOWING CONDITIONS:

\* \* \* \* \* \*

"2. NO SALE SHALL BE CONSIDERED MADE UNTIL DELIVERY HAS BEEN MADE TO THE CUSTOMER AND PAYMENT HAS BEEN RECEIVED.

\* \* \* \* \* \*

"6. ON SALES WHERE THE UNIT OR UNITS ORDERED IS DELIVERED AFTER THE TERMINATION OF SALESMAN'S EMPLOYMENT, WHETHER SUCH TERMINATION BE VOLUNTARY OR OTHERWISE."

Johnson quit in October 1985. He sued for commission on two sales. The first one was "written" on August 20, but not delivered and paid for until November 12, 1985. The second was "written" on October 3, but not delivered and paid for until November 30, 1985. The disputed commissions were $2,156.61 for the first sale and $1,972.07 for the second.

In dismissing Johnson's claim, the trial court recognized that "the sale itself [was] the most crucial part" but went on to expand the written terms of the "Salesman's Compensation Agreement" in describing Johnson's duties:

"8. [Peterbilt] urges that the above term in the contract was necessary. Even though the sale itself is the most crucial part of the transaction, there remains a lot of work to be done when the truck is delivered to the buyer. These tasks include inspection of the truck with the buyer to see if all parts comply with the order. Additionally, some adjustments may be necessary between the buyer and [Peterbilt]. The salesman would also be engaged in the financing of the sale for the buyer."

The trial court concluded that Johnson's "employment contract clearly set[ ] out a term that commissions stop when employment cease[d]. . . ." The trial court also concluded that, absent unconscionability, unjust enrichment, or involuntary servitude, "this Court cannot reform a contract nor enter into the wisdom of a contract."

The main thrust of Johnson's argument on appeal was that the "language in question [was] violative of the public policy of the State of North Dakota and [was] therefore void." He argued that, "in enacting § 34–03–09," "the legislature . . . intended, as all other right-thinking bodies have thought, . . . that one is to be paid for one's labor and that this should be, and is, the policy of our State."

Johnson relied on decisions about general agency principles to support his public policy argument about the effect of the statute. In *Heuvelman v. Triplett Electrical Instrument Co.*, 23 Ill.App.2d 231, 161 N.E.2d 875 (1959), Heuvelman had an oral agreement to sell electrical equipment for Triplett. After Triplett terminated his job, Heuvelman sued for commissions on catalog sales made before termination and on sales made after termination where "in the interval he serviced the accounts." The

trial court entered summary judgment against Heuvelman. On appeal, the court reversed, recognizing the "general rule ... in this and other jurisdictions ... that an agent or salesman who is the procuring cause of a sale is entitled to commission notwithstanding the fact that the sale was consummated by the principal personally or through another agent." 161 N.E.2d at 878.

In *J. & B. Motors v. Margolis*, 75 Ariz. 392, 257 P.2d 588 (1953), Margolis, a used-car salesman, voluntarily left the employment of J. & B. Motors. A jury trial resulted in judgment in his favor for commissions on sales which were completed after the termination of his employment. The Arizona appellate court affirmed, saying:

> "*Unless the contract provides otherwise*, if the activities of the agent, while the relationship of agency exists, are the procuring cause, he is entitled to his commission even though the principal himself ... may have ... completed the final act of negotiation after the employment ceases." (Our emphasis). 257 P.2d at 592.

In *Reed v. Kurdziel*, 89 N.W.2d 479 (Mich.1958), Reed was fired as a salesman under an oral arrangement when he asked about commissions due him. He sued and recovered a judgment for commissions. Among the issues on appeal were several on sales completed after Reed's termination. Again, the judgment was affirmed under the general principle, rejecting the employer's position that it was otherwise agreed orally and noting that Reed's employment was ended "for the purpose of [the employer] receiving the benefit of the sales activities of [Reed] without payment of the commissions." 89 N.W.2d at 484.

In *Reed v. Kaydon Engineering Corporation*, 38 Mich.App. 353, 196 N.W.2d 487 (1972), the court of appeals reversed a summary judgment enforcing a clause in a written salesman's agreement restricting commissions to goods shipped before the salesman's job was terminated. The court of appeals said:

> "On the scanty record presented, neither the trial court nor we could properly make a determination regarding the substantive reasonableness and enforceability of the contractual language relied on by Kaydon." 196 N.W.2d at 489.

No issue of statutory public policy was raised.

In *Oehlrich v. Gateway Realty of Columbus, Inc.*, 209 Neb. 417, 308 N.W.2d 327 (1981), listing commissions to a real estate salesman, for sales completed after his death, were adjudged due and affirmed. A contract clause said that rights to any commission accrued prior to termination "shall not be divested by such termination." The court applied the general principle of agency that an agent is entitled to commission on sales procured by him even though the sales were consummated by the principal after the termination of the agency. No public policy was at stake.

Unfortunately, Johnson's contract provided otherwise. Generally, where it is otherwise expressly agreed, a commission agent is not entitled to compensation for a partial performance, although the services benefit the employer. Restatement (Second) of Agency § 452 comment b (1958). *See also* Restatement (Second) of Agency § 453 comment a ("... [T]he parties are bound by the bargain which they make and if, adverting to the possibility of termination before performance is completed, they provide that no compensation shall be given for merely part performance, such agreement is enforced."). Although his cited decisions were about interpreting the terms of his contract, Johnson's argument is not. His argument is about the lawfulness of the contract denying payment to him for sales made before but completed after his departure.

Was it lawful for Johnson to agree to forego any compensation for his efforts on sales contracted by him but completed after his employment ended? ·

NDCC 9–08–01 says:

"Any provision of a contract is unlawful if it is:

"1. Contrary to an express provision of law;

"2. Contrary to the policy of express law, though not expressly prohibited; or

"3. Otherwise contrary to good morals."

Johnson's argument was that the limiting clause in his contract was contrary to the policy of the law expressed in NDCC 34–03–09:

"An employee who quits the service of his employer for good cause and an employee who is dismissed by his employer for good cause are entitled to such proportion of the compensation which would have become due upon full performance of the contract of employment as the services already rendered by such employee bear to the services he was obligated to render had the contract of employment been fully performed."

This statute was enacted in 1961 to replace two prior statutes. One of those statutes denied "any compensation for services rendered since the last day upon which a payment became due to him under the contract" to "[a]n employee dismissed ... for good cause," the worst kind of employee. Former NDCC 34–03–07 (1960). The other of those statutes mandated apportionment of compensation to "[a]n employee who quits the service of his employer for good cause," the best kind of employee who leaves only for the most distressing reasons. Former NDCC 34–03–08 (1960). This apportionment formula was "such proportion of the compensation which would become due in case of full performance, as the services ... already rendered bear to the services ... to [be] render[ed] as full performance." *Ibid.* The new statute mandated this apportionment formula for good and bad employees alike, both those who quit and those who are fired. NDCC 34–03–09. Since "[t]he greater contains the less," the statute applies to all employees whose employment has ended. NDCC 31–11–05(27); *Wisdom v. State, N.D. Real Estate Commission,* 403 N.W.2d 19 (N.D.1987).

The expressed legislative purpose of the 1961 enactment was "that it meant if a man was discharged, he will be paid for all services he had rendered." (Page 2, Legislative Minutes of Committee Hearing of Feb. 10, 1961 on House Bill 837 in the Thirty–Seventh Legislative Assembly).

This declared legislative policy corresponds to, and seems to adopt and codify well-established remedial principles for all employees. Restatement (Second) of Agency § 456 says:

"If a principal properly discharges an agent for breach of contract, or the agent wrongfully renounces the employment, the principal is subject to liability to pay to the agent, with a deduction for [any] loss caused the principal by the breach of contract:

"(a) the agreed compensation for services properly rendered for which the compensation is apportioned in the contract, whether or not the agent's breach is wilful and deliberate; and

"(b) the value, not exceeding the agreed ratable compensation, of services properly rendered for which the compensation is not apportioned if, but only if, the agent's breach is not wilful and deliberate."

The Restatement's comments explain that this rule "is a special application of the rules stated in the Restatement of Contracts as to the rights of a contracting party who is in default." Comment a. Comment c explains: "Unapportioned services. If the agent has rendered services, compensation for which is not apportioned in the contract of service, and his renunciation or other breach of contract is not wilful, he is entitled to an amount equal to the fair value of his services, not exceeding the agreed compensation, minus any damage caused to the principal by his breach of contract."

None of the cases cited in the majority opinion dealt with a statutory mandate of apportionment of compensation for all employees whose employment has ended. *Powis v. Moore Machinery Co.,* 72 Cal.App.2d 344, 164 P.2d 822 (1945) upheld, as consistent with public policy but without citing any precedent or any statute, a written contract limiting commissions for selling machinery. The salesman voluntarily quit.

His written agreement said: "... [W]e pay you commissions not only for your work in connection with contacting the customer" thereafter, including supervision, instruction and engineering services. The contract reduced commissions in half (from 2% to 1%) if the salesman "cease[d] to be employed by this company before the goods are so invoiced, delivered and paid for." The trial court invalidated the employment agreement to the extent it applied a penalty and forfeiture. The court of appeals reversed, declared that the provision was intended as an "incentive" for the salesman to remain with the company, and held that the agreement was not invalid. *Powis* did not deal with an express public policy mandating apportionment of compensation upon termination of employment. In Johnson's case, the question is whether the limiting provision conflicts with an express policy of law.

Similarly, *Division of Labor Standards Enforcement v. Dick Bullis, Inc.*, 72 Cal. App.3d Supp. 52, 140 Cal.Rptr. 267 (1977) held that an auto salesperson's employment contract, that "No commissions ... shall be payable to a salesman ... for any unit not actually delivered and licensed prior to termination of employment," was not invalid as a penalty or forfeiture. The court of appeals relied on *Powis v. Moore Machinery Co., supra.* A statutory public policy mandating apportionment of compensation was not involved.

Likewise, in *Fox v. Don Siebarth Pontiac, Inc.*, 458 So.2d 575 (La.App.3rd Cir. 1984), the court of appeals affirmed a trial court finding that commission salesmen, one of whom had been terminated from employment by an automobile dealer, failed to prove that they were entitled to their commission for a particular transaction under their oral employment agreement. No public policy issue was raised.

On the other hand, this court has several times favored employers by invalidating commissions of salesmen for less specific public policy reasons. No expressed statutory policy was used in either case. In *Mees v. Grewer*, 63 N.D. 74, 245 N.W. 813 (1932), sales commissions on machinery were voided as against public policy because the salesman was "double-dipping," seeking commission through an agreement with a wholesaler in addition to his agreed commission from the manufacturer. Similarly, in *Glass v. Swimaster Corporation*, 74 N.D. 282, 21 N.W.2d 468 (N.D.1946), this court denied an agreed commission to a salesman for sale of life-belts to the Navy, because it viewed the agreement as an improper means of securing official procurement action. Surely, if unfair terms requiring payment of commissions to employees can be voided for public policy reasons not expressed in statutes, unfair limitations on payment of compensation to employees can be voided for public policy reasons well expressed in a statute.

The majority opinion interprets NDCC 34–03–09 very narrowly as applying to only very disparate and discrete groups of employees, rather than the full range of employees from the best to the worst. This approach downplays the intended purpose of the expressed public policy, making it virtually meaningless.

When a public policy is made important by legislative enactment and when it would be frustrated by contradictory contracts, the policy outweighs enforcement of contrary contract terms. *Erickson v. North Dakota State Fair Association*, 54 N.D. 830, 211 N.W. 597 (1926); *Krein v. Marian Manor Nursing Home*, 415 N.W.2d 793 (N.D.1987); and NDCC 1–02–28 ("The benefit [of the provision of this code] may be waived by any party entitled thereto, unless such waiver would be against public policy.") *See also* Restatement (Second) on Contracts § 178 (1981). I would give substantial weight to the statutory policy embodied in NDCC 34–03–09 as mandating apportionment of compensation to all employees, good and bad alike, when an employment is ended.

I would reverse and remand for redetermination of that proportion of the compensation which would have become due to Johnson upon completion of the two truck sales as his services rendered bear to the

service he was obligated to render to complete those sales.

Therefore, I respectfully dissent.

LEVINE, J., concurs.