2001 ND 78

**Clyde and Dorothy MEYER, Plaintiffs and Appellants,**

v.

**Donald M. HAWKINSON and Marilyn F. Hawkinson, Defendants and Appellees.**

No. 20000093.

Supreme Court of North Dakota.

May 1, 2001.

John T. Goff (argued), Montgomery, Goff and Bullis, Fargo, ND, and Thomas R. Olson (on brief), Jeffries, Olson & Flom, PA, Moorhead, MN, for plaintiffs and appellants.

Daylen D. Ramstad, Wegner, Fraase, Nordeng, Johnson & Ramstad, Fargo, ND, for defendants and appellees.

KAPSNER, Justice.

[¶ 1] Clyde and Dorothy Meyer appeal from the district court's grant of summary judgment for Donald M. and Marilyn F. Hawkinson, dismissing Meyers' claim for enforcement of an alleged contract to share proceeds of the Western Canadian Lottery. The district court found there was a genuine issue as to the existence of a contract between the parties, but granted summary judgment because the alleged contract had an unlawful object and would be unenforceable as contrary to North Dakota's public policy against gambling. We hold the public policy of the state of North Dakota would not allow our courts to enforce an alleged contract to share proceeds of a winning lottery ticket. We affirm.

I

[¶ 2] On August 16, 1997, Clyde Meyer drove his wife, Dorothy Meyer, and their friends, Donald and Marilyn Hawkinson, from Fargo, North Dakota to Winnipeg, Canada to attend the horse races. They planned to split the cost of gas for the trip, as was their custom. After checking into the hotel, Donald Hawkinson purchased a lottery ticket with three quick pick numbers at the hotel gift shop, and then he returned to the lounge to tell Marilyn Hawkinson and the Meyers about his purchase. Clyde Meyer claims Donald Hawkinson said to Clyde, "Go buy three lottery tickets and we'll split." According to Dorothy Meyer, Donald Hawkinson said, "I just bought three tickets for the lottery, and you go in and buy three, and if we win, we'll split." Hawkinson claims he said he felt "pretty lucky" and suggested to Meyer, "Why don't you go buy some," not mentioning any split.

[¶ 3] Dorothy Meyer claims Clyde Meyer said, "Okay," and left the lounge. Clyde Meyer testified he directly turned around, walked to the gift stand, and bought three lottery tickets. Donald Hawkinson testified that when Clyde Meyer returned to the lounge, Meyer may have said he got some lottery tickets. However, according to both of the Meyers and Marilyn Hawkinson, Clyde Meyer said nothing about the lottery or tickets when he returned to the table. It is undisputed that when Meyer returned, he said nothing about the number of tickets he had purchased, and he did not show anyone any lottery tickets.

[¶ 4] The following day Donald Hawkinson discovered that one of his lottery ticket numbers was a winner of $1.6 million Canadian ($1.2 million U.S.). Clyde claims he went to meet his wife in the restaurant and thought he told her, "We won the lottery, Don's ticket."

[¶ 5] The parties had been friends for over forty years, often gambling together. Donald frequently bought lottery tickets, but the parties never pooled their funds to purchase lottery tickets. During their stay in Winnipeg, the parties did not pool their money to bet on horses or to gamble in the casinos. They did have a custom of pooling their money before buying pull tabs, and they would open their pull tabs together and split any proceeds immediately. They also had a custom of splitting the cost of drinks. On this occasion, after Donald won the lottery, he paid for all the Meyers' drinks and meals.

[¶ 6] The Hawkinsons called their children with the news and invited them to come to Winnipeg to celebrate. Clyde Meyer never telephoned anyone to tell them he had won the lottery. Dorothy Meyer testified she talked on the telephone to one of the Hawkinsons' children and may have said Donald Hawkinson won

the lottery and was now a millionaire. Dorothy called her own son and thought she said, "Don had won the lottery." She also called her friend and thought she told her, "Don won the lottery."

[¶ 7] The Hawkinsons and their children arranged for safekeeping the ticket in the hotel safe and later in a safety deposit box. The Meyers did not take part in these arrangements. Later the parties rode together back to Fargo, but there was no mention of splitting the lottery. Two to three weeks later, Donald told Clyde there would be no equal sharing of the winnings, and Clyde said he understood there would be no equal split, but he thought Donald would share the winnings. On about September 17, 1997, Donald sent each of the Meyers $2,500 as a gesture of friendship. Dorothy Meyer stated Clyde expected Donald to buy him a motor home, and so their friendship ended.

[¶ 8] Clyde and Dorothy Meyer filed a civil action against Donald and Marilyn Hawkinson to enforce a contract to share equally in the lottery winnings. The Hawkinsons moved for summary judgment, arguing no reasonable mind could find from the evidence the existence of an enforceable contract, and even if a contract existed, it would be unenforceable as illegal and against public policy. The district court found there was a genuine issue as to whether a contract existed between the parties, making summary judgment inappropriate on that issue. Nevertheless, the district court granted summary judgment for the Hawkinsons, reasoning even if the alleged contract existed, such an agreement would be contrary to North Dakota's public policy against gambling. The district court concluded the alleged contract would be unenforceable because its object, although lawful in Canada, is unlawful in North Dakota as it violates state anti-gambling statutes. The Meyers appealed.

## II

[¶ 9] Summary judgment is a procedural device for properly disposing of a lawsuit without trial if, after viewing the evidence in the light most favorable to the party opposing the summary judgment, there are no genuine issues of material fact or conflicting inferences which reasonably can be drawn from undisputed facts, or if the only issues to be resolved are questions of law. *Dan Nelson Const., Inc. v. Nodland & Dickson*, 2000 ND 61, ¶ 13, 608 N.W.2d 267. Under N.D.R.Civ.P. 56(c), a court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."

## III

[¶ 10] The Meyers argue the district court erred in granting Hawkinsons' motion for summary judgment by finding as a matter of law the alleged contract between the parties is unenforceable because it is contrary to the public policy of North Dakota. We disagree.

[¶ 11] Gambling differs from other business transactions, and ordinary remedies usually are not available to enforce gambling debts. *Hochhalter v. Dakota Race Mgmt.*, 524 N.W.2d 582, 584 (N.D.1994). It is essential to the existence of a contract to have a lawful object. N.D.C.C. § 9–01–02. A contract is void if the consideration given for the contract is unlawful. N.D.C.C. § 9–05–04. A contract is unlawful if it is (1) contrary to an express provision of law; (2) contrary to the policy of express law, although not expressly prohibited; or (3) otherwise contrary to good morals. N.D.C.C. § 9–08–01.

## A

[¶ 12] The Meyers argue the alleged contract is not contrary to an express provision of law because it was entered into in Canada where the lottery is legal and because the alleged contract does not violate the laws of North Dakota. However, whether the alleged contract is contrary to express provision of law in North Dakota is essential to determining whether the contract is enforceable. The question is whether such a contract is enforceable in the courts of North Dakota or whether our courts will not be used to enforce such contracts because they are contrary to the public policy of this state.

[¶ 13] The Constitution of North Dakota, Article XI, § 25, provides:

> The legislative assembly shall not authorize any game of chance, lottery, or gift enterprises, under any pretense, or for any purpose whatever. However, the legislative assembly may authorize by law bona fide nonprofit veterans', charitable, educational, religious, or fraternal organizations, civic and service clubs, or such other public-spirited organizations as it may recognize, to conduct games of chance when the entire net proceeds of such games of chance are to be devoted to educational, charitable, patriotic, fraternal, religious, or other public-spirited uses.

[¶ 14] In 1976, a constitutional amendment gave the legislature limited authority to authorize some forms of gambling. *See* N.D. Op. Att'y Gen. L–178, L–179 (1993). Under that limited constitutional authorization, the legislature enacted N.D.C.C. ch. 53–06.1 describing which games of chance are authorized in North Dakota, the persons and organizations authorized to hold such games of chance, and a regulatory licensing structure to ensure fairness and to ensure proceeds are devoted to purposes required by the constitution. *Id.* at

L–179–80. Under N.D.C.C. § 53–06.1–11.1(2), a licensed organization shall disburse gambling proceeds only for a specified list of educational, charitable, patriotic, fraternal, religious, or public-spirited uses.

[¶ 15] Under North Dakota law, gambling is defined as risking any money or other thing of value for gain, contingent on a lot, chance, or the happening or outcome of an event over which the person taking the risk has no control. N.D.C.C. § 12.1–28–01(1). In addition, N.D.C.C. § 12.1–28–02(2) makes it a class A misdemeanor to:

a. Sell, purchase, receive, or transfer a chance to participate in a lottery, whether the lottery is drawn in state or out of state, and whether the lottery is lawful in the other state or country;

b. Disseminate information about a lottery with intent to encourage participation in it, except that a legal lottery may be advertised in North Dakota; or

c. Engage in gambling on private premises where the total amount wagered by an individual player exceeds five hundred dollars per individual hand, game, or event.

Clearly, an alleged contract to share proceeds of a $1.2 million lottery would be illegal if entered into in North Dakota.[1]

[¶ 16] Our state constitution expressly forbids lotteries and games of chance unless the entire net proceeds are devoted to public-spirited uses statutorily specified as educational, charitable, patriotic, fraternal, and religious. N.D. Const. art. XI, § 25; *see also* N.D.C.C. § 53–06.1–11.1(2). In addition, N.D.C.C. § 12.1–28–02(2), which

---

1. On the basis of the Canadian criminal code, we cannot determine the alleged contract between the Hawkinsons and Meyers would be legal under Canadian law. Section 206, Criminal Code, R.S.C., ch. C–46 (1999) (Can.), delineates offenses in relation to lotteries and games of chance, specifically:

(1) Every one is guilty of an indictable offence ... who

. . . .

(e) conducts, manages or is a party to any scheme, contrivance or operation of any kind by which any person, on payment of any sum of money, or the giving of any valuable security, or by obligating himself to pay any sum of money or give any valuable security, shall become entitled under the scheme, contrivance or operation to receive from the person conducting or managing the scheme, contrivance or operation, or any other person, a larger sum of money or amount of valuable security than the sum or amount paid or given, or to be paid or given, by reason of the fact that other persons have paid or given, or obligated themselves to pay or give any sum of money or valuable security under the scheme, contrivance or operation;

. . . .

A "lottery scheme" is defined as "a game or any proposal, scheme, plan, means, device, contrivance or operation described in any of paragraphs 206(1)(a) to (g), whether or not it involves betting...." Criminal Code, R.S.C., ch. C–46, § 207(4) (1999) (Can.). No cases have been cited to us interpreting these sections under similar facts, and our research has been unable to find any. Because the alleged contract would be illegal under North Dakota law, *see* N.D.C.C. § 12.1–28–02(2), and because it has not been demonstrated that the alleged contract would be legal in Canada either, we do not raise the issue of conflict of laws. *See, e.g., Daley v. Am. States Preferred Ins. Co.*, 1998 ND 225, ¶¶ 7–17, 587 N.W.2d 159 (explaining our significant contacts two-pronged analysis for choice of law issues, when there is a conflict regarding which jurisdiction's laws to apply). Since N.D.C.C. § 9–08–01 voids contracts as unlawful if either contrary to express provision of law *or* contrary to public policy underlying the express law, we find it unnecessary to conduct a choice of law inquiry. *See Cont'l Cas. Co. v. Kinsey*, 499 N.W.2d 574, 580 (N.D. 1993) ("It is an important function of the courts to 'maintain and enforce contracts, unless it clearly appears they contravene public policy or express law.' ").

criminalizes sales, purchases, receipt, or transfer of lottery chances, comprehensively forbids such activities whether the lottery is in state or out of state. By express terms, the statute prohibits these activities even if the lottery is legal in the other state or country. The statute also criminalizes dissemination of information about a lottery with intent to encourage participation in the lottery. Although § 12.1–28–02(2) refers to lottery chances, not proceeds, a chance to share proceeds is really a chance to participate in a lottery.

■ [¶ 17] The alleged contract between the Meyers and Hawkinsons to share lottery winnings is a wager, or "risking any money … or other thing of value for gain, contingent [on a] lot, chance, … or the happening or outcome of an event … over which the person taking the risk has no control," and constitutes gambling under the statutory definition of gambling. *See* N.D.C.C. § 12.1–28–01(1). This Court will not enforce contracts which have an unlawful purpose or unlawful consideration. *See* N.D.C.C. §§ 9–01–02, 9–05–04; *see also Erickson v. North Dakota State Fair Ass'n of Fargo,* 211 N.W. 597, 599, 54 N.D. 830, 836 (N.D.1926) (refusing to enforce an alleged contract to run an illegal horse race for prize money because courts will not aid parties engaged in illegal transactions, but rather will leave the parties where it finds them); *Drinkall v. Movius State Bank,* 88 N.W. 724, 727, 11 N.D. 10 (N.D.1901) (holding neither party to an illegal contract may be aided by the courts, either to set it aside or enforce it).

[¶ 18] We conclude the alleged contract if entered into in North Dakota would violate the express law against gambling. However, the contract was not created in North Dakota, so that does not end our inquiry. The contract may still be unlawful if contrary to the public policy underpinning express law, although not express-

ly prohibited. N.D.C.C. § 9–08–01; *see also Cont'l Cas. Co. v. Kinsey,* 499 N.W.2d 574, 580 (N.D.1993) (noting the importance of enforcing contracts unless they clearly contravene public policy or express law).

## B

[¶ 19] The Meyers argue the alleged contract to share lottery proceeds is not void as against public policy. We are not persuaded.

■ [¶ 20] Public policy is a principle of law whereby contracts will not be enforced if they have a tendency to be injurious to the public or against the public good. *Johnson v. Peterbilt of Fargo, Inc.,* 438 N.W.2d 162, 163 (N.D.1989). Whether the contract is against public policy is generally provided for by the state constitution or statute. *Id.; see, e.g.,* N.D.C.C. § 9–08–02 (providing that all contracts which have for their object exemption of persons from responsibility for their own fraud or willful injury to the person or property of another, or wilful or negligent violation of law, are against the policy of the law). However, when a contract is inconsistent with fair and honorable dealing, contrary to sound policy, and offensive to good morals, the courts have the authority to declare the contract void as against public policy. *Johnson,* at 164; *see also* N.D.C.C. § 9–08–01 (deeming contracts unlawful if contrary to express law; contrary to policy of express law, although not expressly prohibited; or contrary to good morals).

[¶ 21] Despite the constitutional amendment authorizing some limited forms of gambling, the legislature's anti-gambling message remains especially strong regarding lotteries. Section 12.1–28–02(2), N.D.C.C., prohibits the sale, purchase, receipt, or transfer of a chance to participate in a lottery, *whether the lottery is drawn in state or out of state,*

*and whether the lottery is lawful in the other state or country.* (Emphasis added.) We regard the underlined language as clear indication of the public policy against lotteries. The use of our courts in the manner requested by the Meyers would frustrate that policy. In addition to the legislature, the voters have demonstrated opposition to lotteries. In 1986, a constitutional amendment proposed authorizing a state-operated lottery for the purpose of providing tax relief for the citizens of North Dakota. *See* 86–31 N.D. Op. Att'y Gen. Op. 152, 152–53 (1986); *see also* N.D. Const. art. XI, § 25. This proposed amendment met strong resistance. *See* 86–31 N.D. Att'y Gen. Op., at 152. Ultimately, the proposed amendment to establish a North Dakota lottery was defeated in the November 1986 general election. *See id.*

[¶ 22] Other attempts to authorize lotteries in North Dakota have also failed. For example, when the City of Grand Forks inquired whether cities could allow lotteries or other non-licensed games of chance to be conducted within city limits, the Attorney General indicated cities lack that authority. *See* 85–15 N.D. Att'y Gen. Op. 46, 46 (1985). The Attorney General also indicated a private club, which was licensed to conduct games of chance, was prohibited from holding a drawing. *See* 82–7 N.D. Att'y Gen. Op. 17, 17 (1982). The Attorney General determined that a drawing in which members sign their names when entering the club, contribute money, and then the name of one member is drawn who wins the entire pot would constitute a prohibited lottery. *Id.* at 18.

[¶ 23] Accordingly, the public policy in North Dakota runs consistently against lotteries. On the basis of public policy, our courts will not enforce contracts deemed injurious to the public or against the public good. *Johnson,* 438 N.W.2d at 163–64 (indicating that whether a contract is against public policy is generally provided by the state constitution or by statute). For example, this Court has refused to enforce a contract, as against public policy, when the contract defeated the express purposes of a statute. *Schollmeyer v. Saxowsky,* 211 N.W.2d 377, 386 (N.D. 1973). In *Schollmeyer,* we voided a contract provision because the no-recourse clause oppressed the rights of purchasers and defeated the express purposes of a statute protecting them. *Id.* The statute at issue, N.D.C.C. § 10–04–17, held sellers jointly and severally liable to purchasers, for securities sales contracts made in violation of the Securities Act, as well as imposing joint and several liability on officers and directors who aided or participated in the sale. *Id.* Therefore, we invalidated a clause in a debenture contract that prohibited recourse by the purchaser against the officers or directors for payment of the debenture. *Id.* We concluded the no-recourse clause oppressed and restrained the legal rights of the purchasers conferred by the statute. *Id.* Thus, on the basis of public policy, we refused to enforce the contractual provision because it was contrary to the spirit of § 10–02–17 and defeated the statute's purposes of protecting securities purchasers. *Id. See generally Thompson v. First Nat'l Bank in Grand Forks,* 269 N.W.2d 763, 764–65 (N.D.1978) (voiding as against public policy a contract which restricted a trustee's exercise of his discretionary power and which was entered into without knowledge of the court or other interested parties); *Glass v. Swimaster Corp.,* 21 N.W.2d 468, 472–73, 74 N.D. 282, 292 (N.D.1946) (voiding as against public policy a contract which contemplated procuring personal and political influence to secure the Navy's acceptance of a bid to perform services); *Mees v. Grewer,* 245 N.W. 813, 815–17, 63 N.D. 74, 81 (N.D.1932) (voiding as against public

policy a secret contract between an employee and a third person which would allow the employee to serve two masters and give him the power to wrong his principal).

[¶ 24]   The Meyers argue that by refusing them an opportunity to enforce this contract, the courts would only reward those who convert the property of others. They cite cases from other jurisdictions which have enforced alleged contracts to split the proceeds of lotteries, although the lotteries were not legal in the state where the contract was formed. *See, e.g., Pearsall v. Alexander,* 572 A.2d 113, 115–16 (App.D.C.1990) (enforcing an agreement to share the winnings of a jointly purchased lottery ticket as not against public policy, because the parties did not wager against one another on the lottery's outcome, so the agreement was not a prohibited gaming contract); *Talley v. Mathis,* 265 Ga. 179, 453 S.E.2d 704, 705–06 (1995) (enforcing an agreement to jointly purchase a lottery ticket and to share the proceeds, as not violative of either Georgia's statute prohibiting gambling contracts or public policy, because the lottery was legal in Kentucky where the ticket was purchased); *Kaszuba v. Zientara,* 506 N.E.2d 1, 1–3 (Ind.1987) (enforcing a contract entered into in Indiana, whereby Kaszuba would travel to Illinois with Zientara's money to purchase an Illinois lottery ticket for Zientara, because despite the longstanding Indiana public policy against lotteries, prohibiting this contract would not shelter Indiana citizens from legal lotteries in sister states); *Miller v. Radikopf,* 394 Mich. 83, 228 N.W.2d 386, 386–87 (1975) (enforcing an agreement, to jointly buy and divide winnings of an Irish sweepstakes ticket as not against public policy, because state statutes did not prohibit accepting proceeds of winning lottery tickets, but only prohibited selling the tickets); *Castilleja v. Camero,* 414 S.W.2d 424, 425–28 (Tex.1967) (enforcing as not against public policy an agreement made in Texas to jointly purchase a Mexican lottery ticket and split the proceeds, because this contract did not violate the laws of Mexico and, since the parties both had lawful ownership rights to the proceeds, refusal to enforce the contract would violate Texas' strong public policy against conversion of property).

[¶ 25]   Other jurisdictions have refused to enforce contracts to split lottery proceeds because if the winning ticket is not jointly owned, then the parties are wagering against each other on the outcome of the lottery, which violates state statutes against wagering on the outcome of uncertain events over which no party has control.  In *Dickerson v. Deno,* 770 So.2d 63, 64 (Ala.2000), the court voided an agreement to share winnings between Alabama holders of individually owned Florida lottery tickets.  Because the tickets were owned by each individual party, they could only receive the proceeds from the winning lottery ticket as a result of their side agreement to share, not as a result of an ownership interest in the winning ticket. *Id.* at 66.  Thus, the court reasoned the contract was founded on gambling consideration as it was a wager, hedging their bets in an attempt to increase each party's odds of winning the Florida lottery, an uncertain event none of the parties controlled. *Id.* at 66–67.

[¶ 26]   One jurisdiction even refused to enforce an agreement to split lottery proceeds between joint owners of the winning ticket, reasoning their joint venture was formed for the purpose of wagering on the outcome of a contingent event. *See Cole v. Hughes,* 114 N.C.App. 424, 442 S.E.2d 86, 88–89 (1994) (voiding a joint venture agreement entered into in North Carolina to purchase Virginia lottery tickets and equally share winnings because North

Carolina statute prohibits wagers depending on any chance event and voids contracts for the purpose of such wagering). When the parties then tried to enforce their joint venture agreement in Virginia, where the winning lottery ticket was purchased legally, that jurisdiction also refused to enforce the contract because the agreement was based on gambling consideration. *See Hughes v. Cole*, 251 Va. 3, 465 S.E.2d 820, 827 (1996) (voiding the joint venture agreement entered into in North Carolina to purchase Virginia lottery tickets and share winnings, because a Virginia statute prohibited gaming contracts, even though the lottery was legal in Virginia).

[¶ 27] In this case, the Meyers and Hawkinsons did not pool their money to jointly purchase the winning lottery ticket, and therefore Hawkinsons are not converting Meyers' property. Rather, Clyde Meyer and Donald Hawkinson were allegedly exchanging promises to share winnings from their individually owned lottery tickets on the happening of the uncertain event that the numbers drawn in the Canadian lottery matched one of their ticket numbers. Consequently, the alleged contract between Hawkinson and Meyer was a wager or side bet, that is, an attempt to hedge their bets and increase their odds of winning the Canadian lottery.

[¶ 28] We have recognized that courts must be mindful of the right of individuals to enter contracts, when the court is faced with deciding whether a contract is against public policy. *Martin v. Allianz Life Ins. Co. of North America*, 1998 ND 8, ¶ 20, 573 N.W.2d 823. We have also acknowledged that the legislature is much better suited than the courts for setting the public policy of the state. *Id.* The statutory language, as well as the legislative and electoral history, comprehensively and clearly convey the policy underlying North Dakota's repeated rejection of a state-operated lottery and high-stakes gambling. *See Trinity Med. Ctr., Inc. v. Holum*, 544 N.W.2d 148, 152 (N.D. 1996) (providing the "cardinal rule" of statutory construction is that our interpretation must be consistent with legislative intent and done in a manner which will accomplish the policy goals and objectives of the statute). Therefore, we affirm the trial court's grant of summary judgment by finding as a matter of law the alleged contract between Clyde Meyer and Donald Hawkinson is contrary to public policy of the state of North Dakota and unenforceable in our courts.

## IV

[¶ 29] The Meyers further argue that summary judgment was inappropriate because, taking the evidence in the light most favorable to the Meyers, who opposed the summary judgment, there is a genuine issue as to the existence of an enforceable agreement between the parties. Because we affirm the trial court's decision the contract, if it existed, is unenforceable in the courts of North Dakota, consideration of this issue is unnecessary. *See Thompson v. First Nat'l Bank in Grand Forks*, 269 N.W.2d 763, 765 (N.D. 1978) (determining it was unnecessary to decide whether the parties were precluded from enforcing the contract on other grounds when we disposed of the case on the ground of public policy considerations).

## V

[¶ 30] The judgment of dismissal is affirmed.

[¶ 31] GERALD W. VANDE WALLE, C.J., and MARY MUEHLEN MARING, J., concur.

**NEUMANN, Justice, concurring specially.**

[¶ 32] I agree with the result reached by the majority. I write separately because I do not agree with the majority's analysis.

[¶ 33] The majority, at ¶ 1, characterizes the parties' alleged agreement as a "contract to share proceeds of a winning lottery ticket." In fact the agreement, as alleged, is something more. According to the allegations, Donald Hawkinson purchased a lottery ticket on his own, before there was any agreement among the parties. Allegedly, Hawkinson then proposed that Clyde Meyer purchase additional lottery tickets, and Hawkinson would exchange a partial interest in the ticket he already held in return for a partial interest in the tickets Meyer would purchase. In other words, it is alleged that Hawkinson proposed he and Meyer each sell and purchase, transfer and receive, partial interests in chances to participate in the lottery in exchange for other partial interests in chances to participate in the lottery. It is alleged that Meyer accepted the proposal.

[¶ 34] According to the pleadings, this agreement was made in Manitoba, not North Dakota. The majority discusses the hypothetical legality of the parties' agreement, under N.D.C.C. § 12.1–28–02(2), but only because of its relevance as an indicator of public policy. I agree with the majority that the agreement would probably violate N.D.C.C. § 12.1–28–02(2) if it had been made in North Dakota. I respectfully disagree with the majority as to the relevance of this hypothetical violation. In my opinion, the hypothetical legality under North Dakota law is relevant because the Canada Criminal Code has a provision similar to N.D.C.C. § 12.1–28–02(2), and in my opinion the agreement is similarly prohibited under Canadian law.

[¶ 35] Under N.D.C.C. § 12.1–28–02(2)(a), it is a class A misdemeanor to "[s]ell, purchase, receive, or transfer a chance to participate in a lottery, whether the lottery is drawn in state or out of state, and whether the lottery is lawful in the other state or country." Under section 206(1) of the Canada Criminal Code,

> Every one is guilty of an indictable offence . . . who
>
> . . . .
>
> (b) sells, barters, exchanges or otherwise disposes of, or causes or procures, or aids or assists in, the sale, barter, exchange or other disposal of, or offers for sale, barter or exchange, any lot, card, ticket or other means or device for advancing, lending, giving, selling or otherwise disposing of any property by lots, tickets or any mode of chance whatever;
>
> . . . .

[¶ 36] In my opinion, the alleged agreement between Meyer and Hawkinson would violate section 206(1)(b) of the Canada Criminal Code. I therefore disagree with the dissent's position characterizing the alleged agreement as "wholly lawful in Canada, where it was entered."

[¶ 37] The trial court did not decide the legality of the agreement in Manitoba. This Court generally decides only issues that have been thoroughly briefed and argued with a ruling by the court below. *See, e.g., Midwest Cas. Ins. Co. v. Whitetail,* 1999 ND 133, ¶ 17, 596 N.W.2d 341. However, this Court will not set aside a correct result merely because the trial court assigned an incorrect reason, if the result is the same under the correct law and reasoning. *Mandan Educ. Ass'n v. Mandan Pub. Sch. Dist. No. 1,* 2000 ND 92, ¶ 8, 610 N.W.2d 64.

[¶ 38] We cannot enforce a contract with unlawful consideration. *See* N.D.C.C.

§ 9–05–04 (providing that unlawful consideration renders a contract void). Although the trial court unnecessarily, in my opinion, used a public policy analysis for the basis of its decision, it nevertheless reached the correct result in concluding the agreement had an unlawful object and was not enforceable. Because this agreement would violate the Canada Criminal Code and would therefore be unenforceable in a Manitoba court, I would affirm the trial court's judgment of dismissal.

[¶ 39] Willliam A. Neumann.

SANDSTROM, Justice, dissenting.

[¶ 40] Because the majority misapprehends the history of gambling in North Dakota and the working of our gambling laws, and misstates the public policy of our state, I respectfully dissent.

I

[¶ 41] Although a quarter of a century ago, a credible argument might have been made that the public policy of North Dakota opposed the enforcement of a contract relating to gambling, no such argument can prevail today.

[¶ 42] The early years of our statehood were shaped by the corruption of the Louisiana Lottery, the last of the so-called "great national lotteries." So corrupt that it was kicked out of Louisiana, the lottery company, seeking to establish the state as its new base of operations, came to "buy" the North Dakota legislature during its first session. Elwyn B. Robinson, *History of North Dakota* 219–20 (1969); *see also* Report of Investigating Committee, Senate Journal 1019–94, 1st N.D. Legis. Sess. (1889–1890) (detailing the Senate's investigation of the corruption). The report of the Pinkerton detectives would establish there was good reason to believe the legislature was for sale. *Report of the Pinkerton Detective Agency Made to Governor John Miller on the Effort Made to Legalize the Louisiana Lottery During the Session of the First Legislative Assembly in North Dakota* (1890). Governor John Miller, and others of great integrity, had secretly hired the Pinkerton Detectives to document the buying of votes at $500 per vote. Senate Bill 167 was introduced to permit lotteries. *See* Senate Journal 842–46, 1st N.D. Legis. Sess. (1889–1890) (detailing the bill). While the bill passed the Senate, Senate Journal 448–49, 1st N.D. Legis. Sess. (1889–1890), when the investigation of the Pinkerton Detectives was revealed, the reaction was so strong that the bill was indefinitely postponed in the House. House Journal 688, 1st N.D. Legis. Sess. (1889–1890); *see also* Senate Journal 486, 1st N.D. Legis. Sess. (1889–1890) (reporting indefinite postponement). The people sent virtually a whole new legislature to Bismarck for the Second Legislative Assembly and proceeded as rapidly as the cumbersome procedures of the day would permit to adopt the First Amendment to the North Dakota Constitution, prohibiting all "lottery, or gift enterprises."[2] *See North Dakota Centennial Blue Book 1889–1989* 229–31, 432 (1987).

[¶ 43] Over the next 85 years, North Dakota had a rather mixed history on gambling, ranging from Attorney General Nels Johnson, 1945–48, driving the slot machines out of the state, to Elmo Christiansen, in 1954, being convicted of conspiracy to bring illegal gambling into the

---

**2.** At the time, constitutional amendment approval required passage of the proposed amendment by two successive legislative sessions plus ratification by the voters. *See* N.D. Const. art. XV, § 202 (1889) (detailing the procedure for constitutional amendments). The amendment, proposed in 1891, was approved in the 1893 legislative session. 1891 N.D. Sess. Laws ch. 47; 1893 N.D. Sess. Laws 294.

state. Attorney General of North Dakota, *Gambling in North Dakota: A Historical and Legal Perspective* (1976). In 1964 and 1968, constitutional amendments to permit parimutuel betting on horse and dog races were defeated. *Id.* at 6; *see also* 1965 N.D. Sess. Laws ch. 478; 1969 N.D. Sess. Laws ch. 587. In 1972, the text of the First Amendment to the North Dakota Constitution was submitted separately to the voters considering a new state constitution. The gambling provision failed to get the majority vote needed for inclusion in the new constitution and therefore would have been omitted had the new constitution been adopted. *Id.*

[¶ 44] The 1973 legislature, in adopting the New Criminal Code to be effective July 1, 1975, greatly increased the penalties for gambling—from misdemeanors to mostly felonies. 1973 N.D. Sess. Laws ch. 116, § 27; *see also* N.D.C.C. § 12.1–28–02 (1973) (identifying the offense classification scheme).

[¶ 45] The 1975 legislature, at the urging of then-Attorney General Allen I. Olson, proposed a constitutional amendment to legalize gambling for charitable purposes. 1975 N.D. Sess. Laws ch. 616. The aftermath of Watergate and the resignation of President Richard Nixon emphasized the importance of obeying the law and changing, rather than violating, laws with which the people did not agree. Olson cracked down on widespread illegal gambling and urged the people to speak with their ballots. Allen I. Olson, Guest Editorial, *Gambling a Controversial Issue,* Grand Forks Herald, March 14, 1976, at 4.

[¶ 46] After the 1976 approval of the constitutional amendment, the 1977 legislature legalized charitable gambling, requiring the entire net proceeds go to "[n]onprofit veterans, charitable, educational, religious, and fraternal organizations, civic and service clubs, and public-spirited organizations." 1977 N.D. Sess. Laws ch. 473, § 2.

[¶ 47] The 1981 legislature made North Dakota only the third state in the nation—following Nevada and New Jersey—to legalize "Blackjack" or "Twenty-one." 1981 N.D. Sess. Laws ch. 514, § 7 (identifying twenty-one as a permissible game of chance); *see also Gambling at a Crossroads,* Grand Forks Herald, November 3, 1991 (identifying North Dakota as the third state to legalize blackjack). North Dakota became the third state with casinos—this before state lotteries became widespread, before modern riverboat gambling, and before the rise of Indian gambling. *See First Interim Report of the Commission on the Review of the National Policy Toward Gambling* (1975); Melinda Beck and Sylvester Monroe, *Reno on the Red River,* Newsweek, May 17, 1982, at 56.

[¶ 48] In 1993, after the rise of modern state lotteries, the North Dakota legislature repealed the ban on lottery advertising—as long as the lottery was legal where it was conducted. 1993 N.D. Sess. Laws ch. 124; N.D.C.C. § 12.1–28–02(2)(b). North Dakota's legalization of advertising of out-of-state lotteries cannot be reconciled with the majority's claimed public policy against them.

## II

[¶ 49] The majority misperceives the meaning of "lotteries and gift enterprises" as used in the First Amendment to North Dakota's Constitution and now in the current N.D. Const. art. XI, § 25. The term is very broad. Black's Law Dictionary defines a lottery as:

A chance for a prize for a price. A scheme for the distribution of a prize or prizes by lot or chance, the number and value of which is determined by the operator of the lottery. Essential ele-

ments of a lottery are consideration, prize and chance and any scheme or device by which a person for a consideration is permitted to receive a prize or nothing as may be determined predominately by chance.

*Black's Law Dictionary* 947 (6th ed.1990) (citations omitted).

[¶ 50] The meaning of lottery as intended in the First Amendment to the North Dakota Constitution is consistent with the general definition. The definition was established in the Territorial Code of 1877 and incorporated into North Dakota law at statehood.

Lottery defined. A lottery is any scheme for the disposal or distribution of property by chance among persons who have paid, or promised or agreed to pay, any valuable consideration for the chance of obtaining such property, or a portion of it, or for any share of or interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, a raffle, or a gift enterprise, or by whatever name the same may be known.

Revised Codes of the Territory of Dakota, Penal Code, § 373 (1877). With the exception of slight changes in punctuation, the 1877 definition remained the same when incorporated into North Dakota law. *See* N.D.R.C. Ch. 36, § 7217 (1895).

[¶ 51] The majority's analysis is seriously flawed by its misunderstanding of the meaning of "lottery, or gift enterprises" as used in our constitution.

[¶ 52] The majority's analysis is further flawed by its misperception of recent state lottery proposals. The campaigns in opposition to state lotteries in 1986, 1988, and 1996 focused not on the evils of lotteries as opposed to "other forms of gambling," but on the evils of all forms of

gambling and on the State entering into gambling competition with private charities. *See, e.g., King: Lotteries Won't Hurt Charitable Gaming,* Grand Forks Herald, May 26, 1988 (identifying Gorman King Sr. as a "lottery backer," and attributing statements to him that a lottery would not reduce profits of existing charitable gaming); *Lottery Could Wipe Out Many Charities,* Grand Forks Herald, June 9, 1988 (suggesting charities would be devastated by a lottery).

III

[¶ 53] The majority, at ¶ 1, holds "the public policy of the state of North Dakota would not allow our courts to enforce an alleged contract to share proceeds of a winning lottery ticket." The majority misstates the public policy of this State. In the context of contract enforcement, the concept of public policy "is vague and variable." 17A Am.Jur.2d *Contracts* § 258 (1991). Public policy related to contract enforcement is fluid, flexible, and ever-changing:

Public policy has been described as the will-o'-the-wisp of the law which varies and changes with the interests, habits, needs, sentiments, and fashions of the day; the public policy of one generation may not, under changed conditions, be the public policy of another. Thus, the very reverse of that which is public policy at one time may become public policy at another time.

*Id.* (footnotes omitted).

A

[¶ 54] North Dakota public policy does not forbid gambling, but North Dakota does have a public policy against the undue influence and illicit activity that may accompany it. The North Dakota criminal code, substantially revised and effective July 1, 1975, increased the severity of pun-

ishment for gambling offenses. Although once wholly prohibited, after the adoption of a constitutional amendment in 1976, limited gambling became lawful in North Dakota. With the addition of gaming on Indian reservations in North Dakota, games of chance are now commonplace in this State. Although lawful, gambling remains highly regulated. *See* N.D.C.C. ch. 53–06.1 (the regulatory system for gambling in North Dakota). The majority is correct that lotteries remain unlawful in North Dakota. N.D.C.C. § 12.1–28–02(2). North Dakota's public policy permits gambling, and North Dakota's law establishes a regulatory system.

[¶ 55] Whether a contract or one of its provisions "is against public policy is generally provided for by statute or by the State Constitution." *Johnson v. Peterbilt of Fargo, Inc.,* 438 N.W.2d 162, 163 (N.D. 1989) (footnote omitted). "It is primarily the prerogative of the legislature to declare what agreements and acts are contrary to public policy, and to forbid them." 17A Am.Jur.2d *Contracts* § 262 (1991) (footnote omitted). As reflected by legislation authorizing the advertisement in this state of out-of-state lotteries, an agreement to gamble or to share gambling proceeds in Canada is not contrary to our public policy.

[¶ 56] Our public policy applies neither extraterritorially, nor, as in this case, internationally. For example, this Court recently held that although common-law marriages cannot be lawfully entered in this State, we may still recognize a common-law marriage validly entered in Canada. *Pearson v. Pearson,* 2000 ND 20, ¶ 8, 606 N.W.2d 128. We did not exalt our public policy against common-law marriages in *Pearson*. Without support, at ¶ 12 the majority states, "whether the alleged contract is contrary to express provision of law in North Dakota is essential to

determining whether the contract is enforceable." In *Pearson,* an opinion authored by Justice Kapsner, the Court stated that although our own statutes and public policy prohibit common-law marriages, a common-law marriage validly entered into in Canada may be entitled to recognition in North Dakota. *Pearson,* at ¶ 8. Also in *Pearson,* the majority declined to terminate spousal support because of an alleged violation of North Dakota public policy against cohabitation, concluding the practice was acceptable in Canada. *Id.* at ¶ 23. In this case, Canada has clearly authorized lotteries. A contract entered in Canada—that is permissible in Canada—is entitled to recognition here.

[¶ 57] The majority, at ¶ 15, citing N.D.C.C. § 12.1–28–02(2), places great emphasis on the fact that it is a class A misdemeanor to "Sell, purchase, receive, or transfer a chance to participate in a lottery, whether the lottery is drawn in state or out of state, and whether the lottery is lawful in the other state or country." The majority, however, omits the crucial introductory clause, "Except as permitted by law."

[¶ 58] In ¶ 11, the majority cites N.D.C.C. § 9–01–02, stating a lawful object is necessary for a valid contract. In fact, N.D.C.C. § 9–01–02 states, "there *should* be . . . [a] lawful object" (emphasis added).

[¶ 59] The majority also cites § 9–05–04 in ¶ 11, stating a contract is void "if the consideration given for the contract is unlawful." Illegal consideration is "any act or forbearance, or a promise to act or forbear, which is contrary to law or public policy." 17A Am.Jur.2d *Contracts* § 240 (1991). The parties do not dispute that the money, consideration, or promises exchanged by the parties in this case were wholly legal in Canada. The statutes cited by the majority apply to contracts and

conduct in North Dakota, but not to the alleged agreement between the Meyers and the Hawkinsons. As demonstrated by the persuasive analysis of other courts interpreting this issue, all of these facts are immaterial. The important fact is the parties do not dispute that the alleged agreement was wholly lawful in Canada, where it was entered. Canada's criminal code, Part VII—entitled Disorderly Houses, Gaming and Betting—at §§ 202–206 allows lotteries and private bets between individuals who are not in the business of betting.·

[¶ 60] The majority and concurring opinions seek to raise the specious argument of whether the alleged contract was valid in Canada. Whether the alleged agreement violated the law of Canada would likely involve questions of fact and law and therefore would not be suitable for summary judgment. More importantly, however, the plaintiffs argued the agreement was legal in Canada, and the defendants did not dispute the legality in Canada, but merely argued that the agreement violated North Dakota law. We have repeatedly held that issues not raised in the trial court cannot be raised for the first time on appeal. *See, e.g., Cermak v. Cermak*, 1997 ND 187, ¶ 15, 569 N.W.2d 280. The issue was raised neither in the trial court nor on appeal. It is raised for the first time in the majority and concurring opinions here. In the plaintiffs' brief responding to the defendants' motion for summary judgment, the plaintiffs argue:

> it is clear that this hotly contested issue of whether or not there was an enforceable contract is a question of fact for the jury. Further, though lotteries are not legal in North Dakota, the contract was formed in Winnipeg, Canada, where the

lottery is legal. Accordingly, this Court has the power and authority to enforce the binding and legal contract entered into between the parties regarding this legal activity of playing the lottery.

. . . .

Thereafter, at page 13 of the Meyers' brief in opposition to the Hawkinsons' motion for summary judgment, the Meyers reiterate that the Hawkinsons based their argument on the proposition that the contract was illegal in North Dakota. In concluding their brief, the Meyers argued:

> Further, there certainly was nothing *illegal* about any of the parties participating in the lottery or contracting with regard to the lottery at a time they were in Winnipeg, Canada, where the lottery is legal.

[¶ 61] The record reflects that the Hawkinsons never replied to the Meyers' argument. Further, during the hearing on the motion for summary judgment, the Hawkinsons maintained the contract was illegal in North Dakota, but they did not argue the contract was unlawful in Canada. Counsel for the Hawkinsons stated:

> The two points in our brief that we made, of course, was number one, there was never a contract and number two that even if—under the facts as asserted by the plaintiffs there could be a contract. That it's an illegal contract under North Dakota Law.

[¶ 62] The concurring opinion concludes that the contract was unlawful in Canada, an issue never raised below or on appeal.[3] The concurring opinion presumes the agreement was unlawful, notwithstanding the factual questions that were undetermined because, as the concurrence rec-

---

3. In addition to the general exceptions for private bets, the concurring opinion omits this provision of section 206 of the Canadian Criminal Code:

(8) This section does not apply to
(a) the division by lot or chance of any property by ... persons having joint interests in any such property....

ognizes, the trial court improperly granted summary judgment based on a misconceived notion of public policy.

[¶ 63] Although North Dakota's public policy may be demonstrated to a certain extent through the statutes cited by the majority, the clear intent of our public policy is to allow regulated gaming. Seeking to enforce a contract made in Canada to share proceeds of the Canadian lottery does not offend the public policy of this State.

### B

[¶ 64] Courts, including this Court, increasingly decline to render contracts invalid on the basis of public policy. The court's power "to declare a contract void as against public policy must be exercised with caution and only in cases that are free from doubt." 17A Am.Jur.2d *Contracts* § 264 (1991) (footnote omitted). As stated in *Johnson*, 438 N.W.2d at 164:

When a court is faced with deciding whether a contract is against public policy, it must also be mindful of an individual's right to enter into a contract. "It is not the court's function to curtail the liberty to contract by enabling parties to escape their valid contractual obligation on the ground of public policy unless the preservation of the general public welfare imperatively so demands." *Tschirgi v. Merchants National Bank of Cedar Rapids*, 253 Iowa 682, 690, 113 N.W.2d 226, 231 (1962).

[¶ 65] The concept of not enforcing a contract on public policy grounds is based on the notion that enforcing such a contract would have "a tendency to be injurious to the public or against the public good." *Johnson*, 438 N.W.2d at 163 (citing *Ness v. City of Fargo*, 64 N.D. 231, 251 N.W. 843 (1933)). Regardless of whether the contract in this case is enforced, North Dakota's public policy is not offended, be-

cause enforcement would neither encourage nor discourage this type of agreement. *See Miller v. Radikopf*, 394 Mich. 83, 228 N.W.2d 386, 388 (1975) (concluding enforcement of a contract similar to this one would not discourage people from buying or selling lottery tickets even though illegal in that state); *see also Kaszuba v. Zientara*, 506 N.E.2d 1, 2 (Ind.1987) (prohibiting use of the courts to enforce this type of contract does not serve the policy behind the state's constitutional prohibition of lotteries). The majority, at ¶ 15, concludes, "Clearly, an alleged contract to share proceeds of a $1.2 million lottery would be illegal if entered into in North Dakota."

[¶ 66] If the contract at issue here had been made in North Dakota, North Dakota's public policy would apply. Because enforcement of this contract does not implicate our public policy or our laws, however, there is no "tendency" of enforcement of the contract "to be injurious to the public or against the public good." *Johnson*, 438 N.W.2d at 163 (citation omitted).

[¶ 67] Generally, a contract that violates a statute or a state's constitution is illegal and void. But, "the rule that an agreement in violation of statute is illegal and void is not inflexible or inexorable." 17A Am.Jur.2d. *Contracts* § 247 (1991). Even though the agreement may violate our statutes, the majority does not establish that our public policy is offended by enforcement of the obligation in question. As the court stated in *Kaszuba*, 506 N.E.2d at 2–3, in concluding enforcement of an Indiana agreement to share the proceeds of an Illinois lottery ticket was enforceable in Indiana courts:

There is no benefit to the citizens of this State in prohibiting an agreement of this nature. It will not shelter them from lotteries conducted in sister states. It will not deter people from purchasing

lottery tickets in Illinois, Ohio or Michigan. Finding the agreement ... illegal and unenforceable as against public policy, rather than being of benefit to Indiana residents, would instead reward people who convert the property of others to their own use.

[¶ 68] The efficacy of our laws and the regulation of gambling in North Dakota would remain unaffected by enforcement of this agreement. It is infirm to refuse enforcement of this alleged contract, based on a purported North Dakota public policy that would not be implicated by enforcement of the agreement.

### IV

[¶ 69] The majority, at ¶ 23, cites a few cases in which this Court declined to enforce contract provisions on the basis of public policy. In each of those cases, enforcement of the respective contracts would have offended the public policy of this State by contravening our own statutes. Any agreement between Meyer and Hawkinson was lawful in Canada. There is no support for the proposition that our contract law is to have extraterritorial or international application. The majority cites no law or case that would allow this Court to apply our laws or purported public policy extraterritorially.

### A

[¶ 70] The two cases cited by the majority as support for the proposition that this alleged agreement cannot be enforced by our courts deserve little weight.

[¶ 71] Unlike the states in cases relied on by the majority, North Dakota does not specifically prohibit the enforcement of a gaming contract. See Dickerson v. Deno, 770 So.2d 63, 65 (Ala.2000) (Alabama Code § 8-1-150 prohibits enforcement of "payment for actual wagering or gambling"); Cole v. Hughes, 114 N.C.App. 424, 442

S.E.2d 86, 89 (1994) (N.C.G.S. § 16-1 renders gambling contracts void). Such a prohibition was established in the Dakota Territory Code of 1865, but repealed in 1877, and not reestablished in the Territory or this State. See Laws of Dakota 1862–1863 ch. 9, §§ 8-10 ("All notes, bills, bonds, mortgages, or other securities or conveyances" obtained in whole or in part by gaming consideration, "shall be void and of no effect"); Revised Codes of the Territory of Dakota 805 § 2 (1877) (repealing the aforementioned provisions).

[¶ 72] In addition, in each of the cases cited by the majority at ¶¶ 25–26, an agreement to split proceeds was denied enforcement under facts clearly distinguishable from the facts of this case.

[¶ 73] In Dickerson v. Deno, 770 So.2d 63, 64 (Ala.2000), the Alabama Supreme Court denied enforcement of a contract made in Alabama to share the winnings of a Florida lottery ticket. In Dickerson, the court, citing Alabama law, concluded the contract was "founded ... on a gambling consideration" and was therefore void. Id. As noted in its dissenting opinion, Dickerson was decided on the basis of invalid consideration. Id. at 67 (Johnstone, J., dissenting). In Dickerson, five restaurant employees agreed to share winnings of lottery tickets provided, apparently as a gratuity, by a regular customer. Id. at 64. The court concluded the employees' mutual promises constituted unlawful consideration because the parties exchanged promises that were contingent upon the occurrence of the "uncertain event" that the winner of the "Florida lottery matched the numbers on one of the tickets held by the five individuals." Id. at 66–67. In its opinion the Dickerson court stated "the facts in this case show that there was no agreement to jointly purchase or to jointly hold the lottery tickets." Id. at 66.

[¶ 74] The majority, at ¶ 26, cites *Cole v. Hughes,* 114 N.C.App. 424, 442 S.E.2d 86 (1994), and *Hughes v. Cole,* 251 Va. 3, 465 S.E.2d 820 (1996), to support its conclusion. Both cases result from a lottery-ticket-buying-and-chance-sharing scheme by essentially the same parties. In both opinions, the courts refused to enforce an agreement made in North Carolina, by North Carolinians, to share proceeds from winning Virginia lottery tickets. North Carolina, like North Dakota, does not allow lotteries. *Cole,* 442 S.E.2d at 89; N.D.C.C. § 12.1–28–02(2). If, in the present case, the alleged agreement had been made in North Dakota instead of Canada, *Cole* and *Hughes* would be more analogous.

B

[¶ 75] The majority cites, but does not analyze, numerous cases in which courts have allowed enforcement of contracts similar to the alleged contract in this case. Perhaps most on point is *Castilleja v. Camero,* 414 S.W.2d 424 (Tex.1967). In *Castilleja,* two Texas families agreed "to jointly purchase a lottery ticket in the Mexican National Lottery." *Id.* at 425. When one ticket won, the purchaser denied the existence of any proceed-sharing agreement. *Id.* The Texas Supreme Court stated:

> The agreement . . . to jointly purchase a ticket in the National Lottery of Mexico and to divide the proceeds, if any, was not an illegal contract. It neither violated nor aided in the violation of any gaming statute of Texas. The only other jurisdiction involved was Mexico. In Mexico, the purpose of the contract had the express approval of the Mexican government in that the Mexican government has a revenue interest in the lottery. Thus the agreement was to do a lawful thing—participate in the National

Lottery of Mexico, in a lawful manner—by going to Mexico.

*Id.* at 426. The court held, "A contract which is made in one jurisdiction but which relates to and is performed in another jurisdiction is governed by the law of the place of performance." *Id.* (citations omitted). Although the majority ignores the choice-of-law question, under our choice-of-law analysis, Canadian law would apply to this alleged contract. *See Daley v. American States Preferred Ins. Co.,* 1998 ND 225, ¶¶ 13–17, 587 N.W.2d 159 (North Dakota's choice-of-law test for contracts is one of significant contacts followed by choice-influencing considerations). Like the *Castilleja* agreement that "did not relate to or involve Texas law," the alleged contract here does not involve North Dakota law. *Castilleja,* 414 S.W.2d at 427.

[¶ 76] The *Castilleja* court concluded Texas policies and interests were not "sufficiently involved to deny recognition of the right [to enforce the contract] by Texas courts." *Id.* The court stated:

> To justify a court in refusing to enforce a right of action which accrued under the laws of another state, because against the policy of our laws, it must appear that it is against good morals or natural justice, or that for some other reason the enforcement of it would be prejudicial to the general interests of our own citizens.

*Id.* The court concluded that although Texas public policy prohibited lotteries, conversion was more offensive and was the paramount act "contrary to natural justice." *Id.* at 427–28.

[¶ 77] In *Kaszuba v. Zientara,* two residents of Indiana disputed ownership of the proceeds of an Illinois lottery ticket. 506 N.E.2d 1 (Ind.1987). Like North Dakota's constitution, Indiana's constitution prohibits lotteries. *Id.* at 2. The court was asked to decide "whether an Indiana

agreement to purchase an Illinois Lotto ticket, in Illinois, is an illegal and immoral agreement and therefore unenforceable by Indiana courts." *Id.* After first stating the purchase of a lottery ticket is illegal in Indiana, the court stated:

> the agreement in question here was not for the purchase of a lottery ticket in Indiana. It was to effectuate the purchase of an Illinois Lotto ticket in Illinois. If [the defendant] had driven to Illinois himself and purchased the winning ticket, it would have been perfectly legal. While the law in Indiana may prohibit the resale of such a lottery ticket within the confines of this state, there is no law in Indiana prohibiting the possession of such a lottery ticket. Indeed the creation of such a prohibition would not serve the policy behind the constitutional proscription against lotteries.
>
> . . . .
>
> There is no benefit to the citizens of this State in prohibiting an agreement of this nature. It will not shelter them from lotteries conducted in sister states. It will not deter people from purchasing lottery tickets in Illinois, Ohio or Michigan. Finding the agreement . . . illegal and unenforceable as against public policy, rather than being of benefit to Indiana residents, would instead reward people who convert the property of others to their own use.
>
> There is nothing perceptibly evil, vicious, wicked, immoral or shocking to the prevailing moral sense in this agreement.

*Id.* at 2–3. The court concluded, although unlawful in Indiana, the agreement was legal in Illinois and "therefore the underlying agreement is also legal and enforceable in Indiana courts." *Id.* at 3.

[¶ 78] In *Miller v. Radikopf,* the Supreme Court of Michigan concluded an agreement to share lottery proceeds is en-forceable even though unlawful in the state where enforcement is sought. 394 Mich. 83, 228 N.W.2d 386 (1975). In *Miller,* an agreement to split money paid by the Irish Sweepstakes was enforced in Michigan, notwithstanding Michigan law making it a crime to sell, offer for sale, or have lottery tickets in possession with the intent to sell them. *Id.* at 387. Differentiating "illegal enterprises such as the illegal sale of narcotics and bank robberies," the court concluded public policy was not offended by an agreement to share proceeds of the Irish Sweepstakes. *Id.* at 388.

[¶ 79] The Miller court stated:

> Judicial nonenforcement of agreements deemed against public policy is considered a deterrent for those who might otherwise become involved in such transactions. While nonenforcement of [the plaintiff's] claim might tend to discourage people from agreeing to split their legal winnings, nonenforcement would not tend to discourage people from buying or selling Irish Sweepstakes tickets.

*Id.* at 388. The court concluded if the agreement were not enforced, "It could reward, without any corresponding benefit, promissory default." *Id.* Enforcement of the agreement did not offend Michigan public policy. *Id.*

[¶ 80] In *Talley v. Mathis,* 265 Ga. 179, 453 S.E.2d 704, 705–06 (1995), the Georgia Supreme Court concluded an agreement to purchase a Kentucky lottery ticket and to share any proceeds could be enforced in a Georgia court. Although under Georgia law "[g]ambling contracts are void," and although a "contract to do an immoral or illegal thing is void," because "the lottery was legal in Kentucky and the purchase by a Georgia resident of a ticket in that lottery would not necessarily be an immoral or illegal act," the contract was enforceable. *Id.* at 705. The court concluded

Georgia public policy would not be violated by enforcement of the contract, stating:

> The only agreement that is alleged to have been reached ... in Georgia was for the lawful purchase in Kentucky of a ticket in that state's lottery. The consideration for this agreement was the joint contribution of the purchase price of the ticket and the exchange of mutual promises to share in any resulting proceeds. There is nothing unlawful in either the agreement or the consideration.

*Id.* at 706.

[¶ 81] Finally, in *Pearsall v. Alexander*, 572 A.2d 113, 116 (D.C.App.1990), the court concluded a lawful agreement to share the proceeds of the D.C. lottery was enforceable in D.C. courts. The court stated:

> News accounts and personal observations reveal that it is common practice for friends, relatives, and coworkers to pool their resources and purchase large blocks of tickets on those occasions when various state lotteries present exceptionally large prizes. The approach taken by the trial court would make such arrangements perilous indeed, by permitting the unscrupulous holders of winning tickets to renege on their agreement and keep the winnings for themselves.

*Id.* at 117.

### C

[¶ 82] There exists no case to support the majority's belief that North Dakota's purported public policy against lotteries can be used to deny enforcement of an obligation that was wholly legal where made. The majority's lack of cited authority on point is telling. The majority ignores the persuasive analysis of the numerous courts that have considered this concept and have concluded the paramount public policy is enforcement of lawful obligations. I decline to join the majority's effort to be the first to establish such a tenuous legal position.

### V

[¶ 83] Because the majority misperceives our history, misunderstands our law, and misstates our public policy, I cannot concur. Because the majority ignores its duty to enforce lawful contracts, I respectfully dissent.

[¶ 84] Dale V. Sandstrom.